**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 23-5273**

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MATTHEW J. HIGHT,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES COAST GUARD; ADMIRAL KARL L. SCHULTZ, in his official capacity as Commandant of the U.S. Coast Guard,

Defendants-Appellees, and

ST. LAWRENCE SEAWAY PILOTS ASSOCIATION,

Intervenor for Defendants-Appellees.

———————————

On Appeal from the United States District Court for the District of Columbia

———————————

**BRIEF FOR U.S. GOVERNMENT APPELLEES**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MATTHEW M. GRAVES
  *United States Attorney*

MARK B. STERN
JOSEPH F. BUSA
  *Attorneys, Appellate Staff*
  *Civil Division,*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Matthew J. Hight was the plaintiff in the district court and is the appellant here. The United States Department of Homeland Security, the United States Coast Guard, and Admiral Linda L. Fagan, in her official capacity as Commandant of the Coast Guard, were the defendants in the district court and are appellees here. (Admiral Karl L. Schultz was the Commandant at the time this suit was filed and is currently named in this Court's caption, but he left that position in 2022. Admiral Fagan is automatically substituted pursuant to Federal Rule of Appellate Procedure 43(c)(2).) The St. Lawrence Seaway Pilots Association was the intervenor for the defendant in district court and is an appellee here.

There were no amici and no other intervenors in the district court. At the time of filing this brief, the following states had joined an amicus brief filed in this Court: West Virginia, Arkansas, Idaho, Iowa, Kansas, Mississippi, Missouri, Montana, South Carolina, and Utah.

## B.    Rulings Under Review

Hight seeks review of the September 26, 2023, Order and

Memorandum Opinion in *Hight v. U.S. Department of Homeland

Security*, -- F. Supp. 3d --, 2023 WL 6276636 (D.D.C.) (No. 21-cv-3277)

(Leon, J.). The Order is reproduced at page 303 of the Joint Appendix.

The Memorandum Opinion is reproduced at pages 276 to 302.

## C.    Related Cases

This case has not previously been before this Court. Counsel for

the government is unaware of any other related cases within the

meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Joseph F. Busa*
Joseph F. Busa
Counsel for U.S.
Government Appellees

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES......................................................................v

GLOSSARY ...........................................................................................i

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES.............................................................1

PERTINENT STATUTES AND REGULATIONS ....................................3

STATEMENT OF THE CASE ...............................................................3

    A.    Statutory Background...............................................................3

        1.    The history of government regulation of pilotage with the aid of private associations ..............................3

        2.    Coast Guard pilotage regulation under the Great Lakes Pilotage Act of 1960...........................................7

        3.    Coast Guard requirements for pilot training and registration under the Act ...........................................11

    B.    Facts and Prior Proceedings .................................................14

        1.    In the wake of several concerning incidents, plaintiff sought pilot registration before completing his river training. .....................................15

        2.    The Coast Guard denied registration because of plaintiff's poor temperament and incomplete training.......................................................................21

        3.    The district court ruled in favor of the agency............24

SUMMARY OF ARGUMENT .................................................................27

STANDARD OF REVIEW..........................................................................30

ARGUMENT ..........................................................................................31

I.  The Coast Guard Acted Well Within Its Discretion In
    Declining To Register Plaintiff As A Great Lakes Pilot...............31

    A.  The Agency Reasonably Declined To Take A Risk On
        Plaintiff's Insufficient Training And Poor
        Temperament. ........................................................................31

    B.  Plaintiff's Contrary Arguments Disregard Regulatory
        Requirements And The Administrative Record. .................45

II. Plaintiff's Private-Nondelegation And First-Amendment
    Claims Are Not Properly Presented And Fail On The Merits. .....60

CONCLUSION .......................................................................................70

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*American Great Lakes Ports Ass'n v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020) ........................................ 1, 8

*Amor Family Broad. Grp. v. FCC,*
  918 F.2d 960 (D.C. Cir. 1990) ........................................ 59

*ANR Storage Co. v. FERC,*
  904 F.3d 1020 (D.C. Cir. 2018) ...................................... 55

*Collins v. National Transp. Safety Bd.,*
  351 F.3d 1246 (D.C. Cir. 2003) ...................................... 45

*Comcast Corp. v. FCC,*
  526 F.3d 763 (D.C. Cir. 2008) ........................................ 59

*Department of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ................................................... 45

*Deripaska v. Yellen,*
  No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ................ 46

*Environmental Def. Fund, Inc. v. Costle,*
  657 F.2d 275 (D.C. Cir. 1981) ........................................ 46

*Finberg v. U.S. Dep't of Agric.,*
  6 F.4th 1332 (D.C. Cir. 2021) ........................................ 44

*Gibbons v. Ogden,*
  22 U.S. 1 (1824) ........................................................... 4, 5

*Grayscale Invs., LLC v. SEC*
  82 F.4th 1239 (D.C. Cir. 2023) ...................................... 56

*Halverson v. Slater,*
  129 F.3d 180 (D.C. Cir. 1997)......................................... 7

*Harris v. Quinn,*
  573 U.S. 616 (2014) ...................................................... 67

*Hight v. U.S. Dep't of Homeland Sec.*,
    533 F. Supp. 3d 21 (D.D.C. 2021) .................................. 19, 20, 25, 67

*Janus v. American Fed'n of State, Cty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ...................................................... 68, 69

*Keller v. State Bar of California*,
    496 U.S. 1 (1990) ......................................................... 67

*Kotch v. Board of River Port Pilot Comm'rs*,
    330 U.S. 552 (1947) ................................................... 3, 6, 66

*MacLeod v. ICC*,
    54 F.3d 888 (D.C. Cir. 1995) .......................................... 59

*McAfee v. U.S. FDA*,
    36 F.4th 272 (D.C. Cir. 2022) ....................................... 62, 67

*Menkes v. U.S. Dep't of Homeland Sec.*,
    637 F.3d 319 (D.C. Cir. 2011) ................................. 11, 60, 65, 66, 67

*Morgan v. United States*,
    304 U.S. 1 (1938) ....................................................... 46

*Oklahoma v. United States*,
    62 F.4th 221 (6th Cir. 2023), *petition for cert. filed*,
    No. 23-402 (U.S. Oct. 13, 2023) .................................... 63, 64

*Republic Airline Inc. v. U.S. Dep't of Transp.*,
    669 F.3d 296 (D.C. Cir. 2012) ........................................ 55

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*,
    85 F. Supp. 3d 197 (D.D.C. 2015) .................................... 60

*Sunshine Anthracite Coal Co. v. Adkins*,
    310 U.S. 381 (1940) ................................................... 63, 66

*United States v. Chemical Found., Inc.*,
    272 U.S. 1 (1926) ....................................................... 45

*United States v. Morgan*,
    313 U.S. 409 (1941) ..................................................... 45

*West Deptford Energy, LLC v. FERC,*
766 F.3d 10 (D.C. Cir. 2014) ............................................................ 55

*Zevallos v. Obama,*
793 F.3d 106 (D.C. Cir. 2015) ..................................................... 30, 31

**Statutes:**

Act of Aug. 7, 1789, 1 Stat. 53
(codified as amended at 46 U.S.C. § 8501(a)) ....................................... 5

Great Lakes Pilotage Act of 1960:
46 U.S.C. §§ 9301-9308 ............................................................ 7
46 U.S.C. § 9302(a)(1)(A) ...................................................... 8, 41
46 U.S.C. § 9302(a)(1)(B) .......................................................... 8
46 U.S.C. § 9303 ................................................................... 8
46 U.S.C. § 9303(a) ........................................................ 9, 12, 64
46 U.S.C. § 9303(b) ................................................................ 9
46 U.S.C. § 9303(c) ................................................................ 9
46 U.S.C. § 9303(d) ................................................................ 9
46 U.S.C. § 9303(e) ................................................................ 9
46 U.S.C. § 9303(f) ................................................................ 9
46 U.S.C. § 9304(a) ...................................................... 1, 10, 64
46 U.S.C. § 9304(b) .......................................................... 10, 64

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 1331 ................................................................... 1

**Regulations:**

46 C.F.R. § 1.03-50 ........................................................... 21, 59

46 C.F.R. § 1.03-50(j) ............................................................ 21

46 C.F.R. § 401.110(a)(19) ....................................................... 13

46 C.F.R. §§ 401.200-.260 .................................................... 12, 64

46 C.F.R. § 401.210(a)(3) .................................................. 14, 28, 36

46 C.F.R. § 401.211(a) ..................................................................... 12

46 C.F.R. § 401.211(c) ..................................................................... 12

46 C.F.R. § 401.211(e) ..................................................................... 12

46 C.F.R. § 401.220(a) ..................................................................... 12

46 C.F.R. § 401.220(b) ..................................................................... 13

46 C.F.R. § 401.220(b)(1) ................................................................ 19

46 C.F.R. § 401.220(b)(2) ................................................. 24, 27, 32, 53

46 C.F.R. § 401.220(b)(3) ................................................................ 14

46 C.F.R. § 401.220(c) ............................................................... 14, 35

46 C.F.R. § 401.220(d) ..................................................................... 14

46 C.F.R. § 401.220(e) ............................................................... 13, 15

46 C.F.R. § 401.230(a) ............................................ 14, 15, 27, 32, 35, 53

46 C.F.R. § 401.260(a) ..................................................................... 48

46 C.F.R. § 401.320 ......................................................................... 64

46 C.F.R. § 401.320(d) ................................................................ 10, 64

46 C.F.R. § 401.335 ..................................................................... 10, 64

46 C.F.R. § 401.405 ........................................................................... 9

46 C.F.R. § 401.425 ........................................................................... 9

46 C.F.R. § 401.450 ........................................................................... 9

46 C.F.R. § 401.451(a) ....................................................................... 9

46 C.F.R. § 401.710(a) ..................................................................... 10

46 C.F.R. § 401.710(b) ..................................................................... 10

46 C.F.R. § 401.710(d) ............................................................ 10

46 C.F.R. § 401.720(b) ...................................................... 11, 65

46 C.F.R. § 402.210 ............................................................... 14

46 C.F.R. § 402.220(a)(1) ................................................. 13, 19

46 C.F.R. § 402.220(b) ....................................................... 12, 64

## Other Authorities:

Act of Mar. 10, 1797, § 4, 1797 Mass. Acts 104,
    https://perma.cc/Y4GD-34PC................................................6

Act of Mar. 29, 1803, §§ 17-18, 1803 Pa. Laws 542
    https://perma.cc/S9R3-EX9B ................................................5

Act of Feb. 8, 1837, §§ 19-20, 1837 N.J. Laws 110,
    https://perma.cc/YDS7-YGCM ............................................6

Bureau of Foreign & Domestic Commerce, U.S. Dep't of
    Commerce, *Pilotage in the United States* (1917),
    https://perma.cc/FEH9-RSYH..........................................3, 4

81 Fed. Reg. 11,908 (Mar. 7, 2016) ........................................ 8

85 Fed. Reg. 20,088 (Apr. 9, 2020) ............................. 8, 11, 15

# GLOSSARY

JA                          Joint Appendix

## STATEMENT OF JURISDICTION

Plaintiff invoked the district court's federal-question jurisdiction under 28 U.S.C. § 1331. Joint Appendix (JA) 12. The district court granted summary judgment to defendants on all claims on September 26, 2023. JA303. Plaintiff filed a timely notice of appeal on November 20, 2023. JA304-06. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The Great Lakes Pilotage Act of 1960 requires that certain ships hire a Coast Guard-registered pilot "to assist in navigating the difficult waters of the Great Lakes" and the St. Lawrence River. *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 513 (D.C. Cir. 2020). The Act tasks the United States Coast Guard with "certify[ing] pilots, establish[ing] conditions of service, and set[ting] the rates that pilots must charge for their services." *Id.* Consistent with the longstanding history of pilotage regulation in the United States, the Act also empowers the Coast Guard to supervise private pilotage associations that, under the Act and subject to Coast Guard regulation, provide for the "efficient dispatching of vessels and rendering of pilotage services." 46 U.S.C. § 9304(a).

This case involves a Coast Guard decision to deny full pilot registration to a trainee who sought such registration for the waters of Lake Ontario and the St. Lawrence River. In two layers of careful administrative consideration, the Coast Guard explained that the trainee failed to complete the second stage of a Coast Guard-approved training program in which a trainee is required to train on the particularly treacherous waters of the St. Lawrence River. The Coast Guard further explained that the trainee lacked the temperament and judgment necessary for safe pilotage on such difficult waters. The district court upheld the agency's decision in all respects. The questions presented are:

1. Whether the agency reasonably declined to register the trainee as a pilot on the waters of Lake Ontario and the St. Lawrence River in light of the trainee's failure to complete the required course of training on the St. Lawrence River and evidence of poor temperament and judgment.

2. Whether plaintiff forfeited his contentions that having to receive training from a private organization subject to Coast Guard

supervision violates the private-nondelegation doctrine and the First

Amendment, and whether those arguments fail in any event.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the

addendum to this brief.

## STATEMENT OF THE CASE

### A.   Statutory Background

#### 1.   The history of government regulation of pilotage with the aid of private associations

"In order to avoid invisible hazards, vessels approaching and

leaving ports must be conducted from and to open waters by persons

intimately familiar with the local waters." *Kotch v. Board of River Port

Pilot Comm'rs*, 330 U.S. 552, 557-58 (1947). "Pilots are thus

indispensable cogs in the transportation system of every maritime

economy." *Id.* at 558. And they have long been regulated by the

government, with the aid of private pilotage associations. "Pilotage

systems were established in England as early as the fourteenth century

and had their origin in the formation of pilot guilds or associations."

Bureau of Foreign & Domestic Commerce, U.S. Dep't of Commerce,

*Pilotage in the United States* 7 (1917), https://perma.cc/FEH9-RSYH.

"[P]ilot associations in this country" have also traditionally been "organized after the manner of guilds" in "close corporations." *Id.* at 8. "At practically every large port in the United States all of the licensed pilots belong to an association, which is an important factor in the conduct of the pilotage service at that port" under state law. *Id.* at 27.

States have traditionally vested "administration of all matters relating to pilotage" in a "local board of pilot commissioners"—state officials generally appointed by the governor. *Pilotage in the United States*, *supra*, at 10. State commissioners generally license pilots based on completion of an apprenticeship, passing an examination, and evaluation for "[t]rustworthiness and general fitness." *Id.* at 14-17, 19-21. Private pilot associations and their private members traditionally train apprentices, *id.* at 15, and serve as a centrally organized system for ownership and maintenance of pilot boats and facilities, communication among pilots and ships, and dispatching licensed pilots to provide pilotage services on a rotating basis, *id.* at 28.

"When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every State." *Gibbons v. Ogden*, 22 U.S. 1, 207 (1824). The first Congress,

concerned that the new Constitution would otherwise displace this system of state pilotage regulation, enacted a statute providing that "all pilots in the … ports of the United States, shall continue to be regulated in conformity with the existing laws of the States … or with such laws as the States may respectively hereafter enact … until further legislative provision shall be made by Congress." *Id.* at 116-17, 208 (quoting Act of Aug. 7, 1789, 1 Stat. 53, 54 (codified as amended at 46 U.S.C. § 8501(a))). Congress thus "adopt[ed]" the pre-existing system of state pilotage regulation and "g[a]ve[] it the same validity as if [the] provisions [of state law] had been specially made by Congress." *Id.* at 207.

In doing so, Congress adopted state pilotage laws that gave licensed pilots an important role in the training and licensing of new pilots. Pennsylvania, for example, required applicants to complete an apprenticeship with a licensed pilot and complete a minimum number of trips on particular waters under the supervision of licensed pilots or masters. Act of Mar. 29, 1803, §§ 17-18, 1803 Pa. Laws 542, 552-54, https://perma.cc/S9R3-EX9B. New Jersey required every licensed pilot boat on certain waters to "attend diligently to the instruction of [at least

5

two] apprentices," for four years of apprentice status and two years of deputy pilot status, and further required that only licensed pilots, or the deputies and apprentices under their charge, could provide pilotage services on those waters. Act of Feb. 8, 1837, §§ 19-20, 1837 N.J. Laws 110, 116-17, https://perma.cc/YDS7-YGCM. Massachusetts similarly provided that licensed pilots could "employ such deputies as [they] may find necessary," and it further provided that persons seeking to become licensed pilots must receive the recommendation of the private "Marine Society of Boston" attesting to whether the person is "capable and suitable to undertake the business of" pilotage over the local waters. Act of Mar. 10, 1797, § 4, 1797 Mass. Acts 104, 104, https://perma.cc/Y4GD-34PC (emphasis omitted).

"[I]n the light of [this] history," the Supreme Court has long held that states have "constitutional authority" to require that those who wish to become pilots must first complete a "six month apprenticeship under incumbent pilots" organized into a private pilotage association. *Kotch*, 330 U.S. at 554, 559, 564 (rejecting equal protection challenge).

### 2.    Coast Guard pilotage regulation under the Great Lakes Pilotage Act of 1960

**a.** Subsequent legislation has displaced state pilotage regulation in certain areas of particular federal interest, including, as relevant here, the Great Lakes Pilotage Act of 1960, 46 U.S.C. §§ 9301-9308. "Construction of the Saint Lawrence Seaway was completed in 1959, opening the Great Lakes to international shipping" and resulting in "a marked increase in the volume of both domestic and international marine traffic navigating the Great Lakes." *Halverson v. Slater*, 129 F.3d 180, 182 (D.C. Cir. 1997). To address safety concerns arising from increased traffic, and to coordinate with Canadian government regulation on that section of the northern border, the Act "requires foreign vessels and American vessels participating in foreign trade to hire an American or Canadian maritime pilot to assist in navigating the difficult waters of the Great Lakes" and the St. Lawrence River. *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 512-13 (D.C. Cir. 2020).

In particularly difficult waters designated by the President, the pilot "direct[s] the navigation of the vessel subject to the customary authority of the master" of the vessel. 46 U.S.C. § 9302(a)(1)(A). In

7

undesignated waters, the pilot need only "be on board and available." *Id.* § 9302(a)(1)(B). As relevant here, the President has designated the waters of the St. Lawrence River, among others, as requiring a pilot to be "fully engage[d]" to "navigate the vessel at all times." *See* 81 Fed. Reg. 11,908, 11,910 (Mar. 7, 2016). The President has left the other waters of the Great Lakes region, such as Lake Ontario, undesignated. *Id.*

"The Act authorizes the Coast Guard to certify pilots, establish conditions of service, and set the rates that pilots must charge for their services." *American Great Lakes Ports Ass'n*, 962 F.3d at 513 (citing 46 U.S.C. § 9303).[1] The Coast Guard "shall prescribe by regulation standards of competency to be met by each applicant for registration." 46 U.S.C. § 9303(a). If the Coast Guard determines that an applicant meets the Coast Guard's standards, the Coast Guard issues a "certificate of registration" of such duration as the Coast Guard may

---

[1] The Act assigns specified duties to the Secretary of Homeland Security. The Secretary has delegated those duties to the Coast Guard. 85 Fed. Reg. 20,088, 20,089 & n.8 (Apr. 9, 2020). The regulations promulgated under the Act assign certain duties to specific Coast Guard officials, such as the Commandant or the Director of Great Lakes Pilotage. For simplicity, this brief generally refers to the Coast Guard.

provide "describing the areas within which the pilot may serve." *Id.*
§ 9303(b), (c). The Coast Guard "may suspend or revoke a certificate of
registration … if the holder fails to comply with a regulation prescribed"
under the Act. *Id.* § 9303(e). The Coast Guard prescribes by regulation
"the conditions for service by United States registered pilots," *id.*
§ 9303(d), and the "rates and charges for pilotage services," *id.* § 9303(f);
*see, e.g.*, 46 C.F.R. § 401.405 (setting rates and charges for pilotage
services); *id.* § 401.425 (describing when two pilots may be required per
ship); *id.* § 401.450 (establishing a method for determining when a pilot
assignment is complete); *id.* § 401.451(a) (establishing pilot rest
periods).

**b.** Consistent with the longstanding practice of regulating pilotage
with the aid of private pilotage associations that form pools of eligible
pilots, the Act, in order to "provide for efficient dispatching of vessels
and rendering of pilotage services," empowers the Coast Guard to
"authorize the formation of a pool by a voluntary association of United
States registered pilots." 46 U.S.C. § 9304(a).

The Coast Guard closely regulates authorized pilotage
associations. Among other things, the Coast Guard may "limit the

9

number of the pools," "prescribe regulations for their operation and administration," and "perform audits and inspections" of the pools. 46 U.S.C. § 9304(b). Coast Guard regulations provide that an authorized pilotage association must agree, among other things, to "submit [its] working rules for approval" by the Coast Guard and "be subject to such other provisions as may be prescribed by" the Coast Guard "governing the operation of … the pools." 46 C.F.R. § 401.320(d). Authorized pilotage associations must, among other things, "[d]ispatch pilotage service under the terms of its approved working rules" and "[c]omply with the terms of any agreement" between Canada and the United States regarding pilotage services. *Id.* § 401.710(a), (b), (d). The Coast Guard may suspend or revoke a pilotage association's authorization if the Coast Guard determines that the association has failed to comply with any of the Coast Guard's requirements. *Id.* § 401.335.

The Coast Guard has authorized three pilotage associations to be "the exclusive U.S. source of registered pilots on the Great Lakes" in three geographic districts. *E.g.*, 85 Fed. Reg. 20,088 (Apr. 9, 2020) (setting 2020 pilotage rates). The pilotage associations use pilotage fees

10

paid by shippers (at rates established by the Coast Guard through rulemaking) to "cover operating expenses, maintain infrastructure, compensate working pilots, and train new pilots." *Id.* If an authorized pilotage association were to be unable to provide adequate pilotage services in its authorized district, the regulations provide that the Coast Guard may "order any U.S. registered pilot to provide pilotage service." 46 C.F.R. § 401.720(b); *see Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 331 (D.C. Cir. 2011) (upholding Coast Guard determination to cease dispatching a particular registered pilot to provide pilotage services, where the authorized pilotage association had become capable of providing adequate pilotage services using its registered-pilot members).

### 3. Coast Guard requirements for pilot training and registration under the Act

This case involves the standards for obtaining Coast Guard registration. As noted, the Act provides that the Coast Guard "shall prescribe by regulation standards of competency to be met by each applicant for registration." 46 U.S.C. § 9303(a); *see* 46 C.F.R. §§ 401.200-.260. The Coast Guard "determine[s] the number of pilots required to be registered in order to assure adequate and efficient

pilotage service," 46 C.F.R. § 401.220(a), and further "determine[s] the number of Applicant Pilots required to be in training by each Association … to assure an adequate number of Registered Pilots," *id.* § 401.211(a).

After an association identifies the candidates it would like to train, "[i]ndividuals [are] selected as Applicant Pilots by" the Coast Guard. 46 C.F.R. § 401.211(e). Training can be provided only by registered pilots who have been approved as trainers by the Coast Guard. *Id.* § 401.211(c). The Coast Guard also reviews and approves or rejects a pilot association's training plan. *See id.* § 402.220(b) (establishing certain minimum criteria necessary, but not sufficient, for approval); JA131-37 (example of training plan approved by Coast Guard).

After passing certain milestones set out in an approved training plan, a person in training with a pilotage association may, in the Coast Guard's discretion, receive limited registration "to provide pilotage service without direct supervision from a fully registered pilot in a specific area or waterway" while continuing a training program and working towards becoming a fully registered pilot. 46 C.F.R.

§ 401.110(a)(19). The Coast Guard generally issues limited certificates of registration in the form of temporary certificates that are valid for one year. *Id.* § 401.220(e).

In a district for which a pilotage association has been authorized, applicants for full registration are eligible if they satisfy certain criteria. Among other things, applicants must have satisfied a baseline minimum-trips requirement by "complet[ing] the minimum number of trips prescribed by" the Coast Guard "over the waters for which application is made on oceangoing vessels, in company with a Registered Pilot, within 1 year of date of application." 46 C.F.R. § 401.220(b); *see also id.* § 402.220(a)(1). In addition to that minimum-trips requirement, the applicant must also have "completed a course of instruction for Applicant Pilots prescribed by the association," as reviewed and approved by the Coast Guard. *Id.* § 401.220(b). That Coast Guard-approved course of instruction may, as appropriate, mandate additional trips beyond the baseline minimum-trips requirement and may, in particular, require more trips over designated waters in order to demonstrate competence. *See* JA135, 294. Finally, the applicant must have "satisfactorily complete[d] a written

examination prescribed by" the Coast Guard, 46 C.F.R. § 401.220(b)(3), must be "of good moral character and temperate habits," *id.* § 401.210(a)(3), and must pass a physical and vision examination, *id.* § 402.210.

The association that has been training the applicant pursuant to a Coast Guard-approved training plan "submit[s] to the Director in writing its recommendations together with its reasons for the registration of the Applicant." 46 C.F.R. § 401.220(c). The Coast Guard then determines whether an applicant has satisfied all the requirements of registration and, if so, issues a certificate of registration describing the parts of the Great Lakes within which the pilot is authorized to perform pilotage services, which is valid for five years and subject to renewal. *See generally id.* §§ 401.220(d), 401.230(a).

## B.    Facts and Prior Proceedings

This appeal arises from a decision of the district court (JA276-302) upholding the Coast Guard's 2022 decision (JA269-75) not to register plaintiff Captain Matthew Hight because plaintiff did not

14

complete the required course of training and because he lacked the

appropriate temperament for the job.

> ### 1. In the wake of several concerning incidents, plaintiff sought pilot registration before completing his river training.

The Coast Guard has authorized the St. Lawrence Seaway Pilots

Association as the pilotage pool in a geographic area, district one, that

covers the particularly difficult (and thus designated) waters of the St.

Lawrence River and the undesignated waters of Lake Ontario. *See* 85

Fed. Reg. at 20,089. The Coast Guard-approved training plan in district

one (JA131-37), like most training plans for pilots in the United States,

*see* JA270, provides for two stages of training, JA132.

In the first stage, the trainee makes all voyages with a registered

pilot who instructs the trainee in pilotage skills and evaluates the

trainee using specified performance standards. JA132-33. Following

successful completion of the first stage, the trainee may, at the Coast

Guard's discretion, receive a temporary and limited registration from

the Coast Guard and proceed to stage two. JA135; 46 C.F.R.

§ 401.220(e). While the trainee is in stage two, he or she may "work

alone in the undesignated waters" of Lake Ontario, without the in-

person oversight of a fully registered pilot, subject to periodic "spot-check[s]." JA135. In addition to solo piloting on Lake Ontario pursuant to a limited and temporary registration, a stage two trainee "will continue to make trips in the designated waters" of the St. Lawrence River "in the company of Registered Pilots" to "work towards completion" of training requirements "which are specific to the designated waters of the district." JA135-36.

The Coast Guard selected plaintiff to participate in this training program in 2015. JA196. In 2016, the Association provided the Coast Guard with its evaluation of plaintiff's performance of the first stage of training and recommended he be advanced to the second stage. JA130. The Coast Guard agreed and issued plaintiff a temporary and limited certificate of registration allowing him to solo pilot ships on the undesignated waters of Lake Ontario (but not the designated waters of the St. Lawrence River) without the on-board supervision of a fully registered pilot while he worked toward completion of the second stage of training over all of the waters of district one. The Coast Guard renewed that limited and temporary registration in the following years. JA152, 226.

16

During the time in which plaintiff was in the second stage of training, plaintiff completed only "two, one-way trips on the St. Lawrence River," only one of which was actually "observed by a supervising pilot." JA293. Rather than pursue river training, plaintiff instead "focused on maximizing time on Lake Ontario and the income he could earn" there under his limited and temporary license, making approximately 100 lake trips each season. JA270.

Significant concerns about plaintiff arose in 2018 when the Coast Guard's Director of Great Lakes Pilotage was conducting a regular stakeholder meeting with shippers and ship owners. JA182. The Director was approached by the owner of a Canadian tugboat that, according to the owner, had been damaged by an American pilot during the summer of 2017. JA182. Concerned about this previously unreported incident and its potential ramifications for the expected standards of diligence and candor in Great Lakes pilotage, the Coast Guard investigated, and the Association did as well. JA182.

These investigations revealed two concerning incidents. The first incident occurred when plaintiff was operating a vessel as a solo pilot on Lake Ontario. At plaintiff's direction, a tugboat was "pushing" plaintiff's

17

vessel "to keep her in the channel." JA218. The "tug struck a channel buoy" that rendered the tug a "total loss." JA153, 218. Plaintiff never reported this incident to the Association or the Coast Guard. JA218. When he was questioned many months later, JA218-19, he admitted that he "should have picked up the phone immediately," JA100.

The other incident involved a heated argument with a ship's master (*i.e.*, captain) on the master's bridge. JA153. Plaintiff "badly shouted" at the master for discussing a safety issue with the master's chief officer while plaintiff was giving course corrections. JA172. (Plaintiff has accounted for this behavior on the ground that he had to "demand quiet" because the master was "speaking [too] loudly." Br. 42.) After docking was complete, the pilot then "threatened [the master] in abusive language." JA173. Plaintiff admitted that he "raised [his] voice to the master, JA100, and that after docking he repeatedly used "expletives" ("F-bombs," JA153) and accused the master of lacking "situational awareness," JA101. Plaintiff later "openly admit[ted] and acknowledge[d]" that he "should have handled the [bridge] situation better" and "accept[ed]" the Association's "observation" about his lack of "Anger Management skills." JA101-02.

While the Coast Guard was continuing to investigate these incidents, *see* JA157, plaintiff—apparently concerned about his future in the training program—requested that the Coast Guard administer the exam that is one pre-requisite for full registration. He also requested that, if he passed, he be granted an unrestricted certificate of full registration. JA158, 164. The Coast Guard declined to administer the examination on the grounds that: (i) plaintiff had not satisfied the minimum-trips requirement, 46 C.F.R. §§ 401.220(b)(1), 402.220(a)(1); and (ii) that the Coast Guard "has always proctored the examination after having received the recommendation by the association that oversaw the applicant's training, and never beforehand." JA125-26.

In other litigation that preceded the present case, a district court vacated the Coast Guard's decision and remanded for the "Coast Guard to administer the written examination to Plaintiff." *Hight v. U.S. Dep't of Homeland Sec.*, 533 F. Supp. 3d 21, 31 (D.D.C. 2021). The court concluded that neither reason identified by the Coast Guard was a precondition to administering the exam. The court determined that plaintiff had satisfied the baseline minimum-trips requirement and that the federal government had conceded, by failing to timely address the

19

issue in briefing, that a positive recommendation was not a prerequisite. *Id.* at 27-30.

The court "expresse[d] no view on whether, if Plaintiff passes the pilotage examination, Plaintiff otherwise qualifies as a registered pilot for District One." *Hight*, 533 F. Supp. 3d at 31. In particular, the court did not address the requirements that a pilot seeking registration must display good temperament and must complete the prescribed course of training, which may include additional trips beyond the minimum-trip requirement in order to demonstrate competence. The court emphasized that the requirement to complete a course of training, such as the two-year second phase of river training at issue here, is "separate[]" from the baseline minimum-trips requirement that the court had concluded plaintiff satisfied during and before his first phase of training. *Id.* at 29.

On remand, plaintiff passed the written exam, JA82, and he requested that he be fully registered for all the waters of district one, including the St. Lawrence River, JA83. The Association continued to recommend that he not be registered. JA67; *see also* JA153-54, 216-25.

### 2. The Coast Guard denied registration because of plaintiff's poor temperament and incomplete training.

The Coast Guard Director of Great Lakes Pilotage denied registration because plaintiff had not completed the second stage of the training program, and thus had not demonstrated his ability to navigate the challenging waters of the St. Lawrence River, and because of plaintiff's "unprofessional conduct and a troubling lack of candor" in several incidents. JA85-87. Plaintiff sought further administrative review, and the Coast Guard Director of Marine Transportation Systems, exercising authority delegated to him by the Commandant, issued a final agency decision upholding the initial decision to deny plaintiff full registration. JA269-75; *see* 46 C.F.R. §§ 1.03-15(j), 1.03-50.

The agency concluded that plaintiff "has not completed the requisite training program; he does not possess a favorable recommendation from the pilotage association; and he lacks the appropriate temperament to serve as a pilot." JA269. The agency explained that plaintiff failed to complete his training because, while plaintiff "focused on maximizing time on Lake Ontario and the income he could earn while in" the second stage of his training under a limited

21

and temporary certificate of registration, "he neglected his responsibility to continue his supervised training on the Saint Lawrence River, which was necessary to complete the training plan." JA270.

"Navigating the Saint Lawrence River is far more challenging tha[n] the open waters of Lake Ontario" because the river "is marked by numerous small islands and rocky outcrops, extremely narrow channels with vessel control regulations, swift currents, ice flows and three sets of Seaway locks," all of which "require[] exacting pilotage skill and local knowledge" that can only be gained with experience. JA271. While plaintiff "has adequate Lake experience, he has comparatively little River experience." JA271. The agency saw "no evidence that [plaintiff] is qualified for full registration on *all* waters of District 1 and s[aw] no reason to depart from the standard training and qualification process used … around the nation and [by] the Coast Guard in the Great Lakes," in which applicants complete the full second stage of training before becoming full registered pilots. JA272 (emphasis added).

The agency noted that "[a] pilot association or training committee's recommendation to a licensing body is standard industry practice" and "informs a licensing body … that the pilots who have

overseen a deputy pilot's training are satisfied that he or she has acquired the necessary experience and has demonstrated expertise needed to safely solo pilot vessels" through dangerous local waterways. JA272. The agency explained that, under the Act and longstanding agency practice, the agency was free to consider the Association's "input" when deciding whether an applicant was fit for registration. JA273. The Association recommendation against registration further bolstered the agency's own determination on that point. JA275; *accord* JA87 (initial agency decision explaining that the initial decisionmaker "would deny your request even with a positive endorsement" from the Association).

The agency noted as "an additional basis" for its decision "the calm demeanor and professional temperament necessary to safely pilot foreign vessels throughout the waters" of district one. JA274. The agency emphasized the role of interpersonal dynamics, including the "inability to cooperate with other crew members," as major contributors to marine accidents. JA274. The agency stressed that "marine pilots work in a high-stakes, dynamic environment on unfamiliar vessels and with an unfamiliar bridge team" for whom "English is likely to be a

secondary language." JA274. Concluding that plaintiff had "demonstrated a temperament inconsistent with the professionalism necessary to reduce risk to the vessel and environment," the Coast Guard noted "the several incidents cited in" the lower-level decisionmaker's initial decision, such as the tugboat incident discussed above, and "particularly the heated argument on the bridge," and further noted "the increasingly antagonistic and aggressive tone of [plaintiff's] numerous emails" to Coast Guard officials and staff. JA274.

### 3.    The district court ruled in favor of the agency.

Plaintiff brought this suit against the federal government defendants, represented by the Department of Justice. The private Association, represented by private counsel, intervened in support of defendants. The district court granted summary judgment to the defendants and upheld the agency's decision in all respects. JA276-302.

The court first rejected plaintiff's contention that the resolution of the prior litigation precluded the government from declining to register plaintiff. JA288-91. The court then held that the Coast Guard was not arbitrary and capricious in determining that plaintiff had failed to complete his training, as required by 46 C.F.R. § 401.220(b)(2). JA292-

24

95. That training requirement, the court explained, citing the opinion in the prior litigation, is "separate[]" from the baseline minimum-trips requirement at issue in the prior case. JA289 (alteration in original) (quoting *Hight*, 533 F. Supp. 3d at 29). The minimum-trips requirement "is a *minimum* standard" and Coast Guard-approved training programs, as here, may require additional trips over a longer training period to establish competency. JA294 (quoting JA210).

As to the training requirement, which was not at issue in the first litigation, the court explained that it was undisputed that plaintiff had completed only "two, one-way trips on the St. Lawrence River in the 22 months" he had been in the second training stage, only one of which was actually "observed by a supervising pilot." JA293. Plaintiff "otherwise spent his time" during stage two "providing solo services on Lake Ontario, making almost 200 trips in those waters as well as the income that came with them." JA293. "For the Coast Guard to examine these facts and conclude, as it did, that" plaintiff "neither completed the [Association's] training plan, nor otherwise 'demonstrate[d] the proficiency and expertise required to safely solo pilot vessels through [the] challenging and dangerous designated waters' of the St. Lawrence

25

River, is surely not unreasonable." JA293 (second and third alterations in original) (quoting JA272).

The court concluded that the Coast Guard properly considered the Association's negative recommendation because "[t]he parties unequivocally agree that the Coast Guard is not barred from at least *considering* an association's recommendation." JA296. The Coast Guard "*did* exercise its own judgment in denying registration," and nothing in the record "suggests the Coast Guard treated the [Association's] recommendation as dispositive." JA297-98.

The court also held that the agency reasonably concluded that plaintiff lacks the necessary temperament to be a pilot. JA299-301. The court explained that the tugboat incident and the heated argument on the bridge "alone, even crediting [plaintiff's] version of them, are likely enough" to sustain the agency's finding on this point. JA300. When viewed in light of corroborating evidence, such as plaintiff's "antagonistic and aggressive" emails to Coast Guard staff, those incidents were more than substantial evidence supporting the agency's conclusion. JA300 (quoting JA274). Finally, the court declined to address plaintiff's other private-nondelegation and First-Amendment

26

claims, which would "only become ripe" if plaintiff were to be "qualified as a registered pilot." JA288 (alterations and quotation marks omitted).

## SUMMARY OF ARGUMENT

I. The Coast Guard reasonably declined to risk the safety of Great Lakes pilotage by registering plaintiff as a full pilot for two independent reasons.

First, plaintiff did not "complete[]" his "course of instruction" on the dangerous waters of the St. Lawrence River. 46 C.F.R. § 401.220(b)(2). Plaintiff's Coast Guard-approved training plan required that, during the second phase of his training, he "continue to make trips in the designated waters" of the St. Lawrence River "in the company of Registered Pilots" in order to demonstrate competency to solo-pilot a vessel in those particularly challenging waters. JA135. Instead of doing so, plaintiff focused almost exclusively on making trips on Lake Ontario and made only a half-round trip on the St. Lawrence River performing the duties of a pilot under the documented supervision of a registered pilot. JA293. On appeal, plaintiff does not dispute the agency's reasonable conclusion that a half-round trip is not enough to demonstrate competency. Plaintiff instead argues that applying the

27

terms of the regulation was inconsistent with Coast Guard practice. But those allegations are not supported by the record. Plaintiff does not identify any trainee who obtained full registration despite having similarly limited river experience at the time of registration.

Second, the Coast Guard reasonably concluded that plaintiff lacks the "good moral character and temperate habits" befitting a Great Lakes pilot. 46 C.F.R. § 401.210(a)(3). Hot tempers and lapses of judgment under stress are major causes of marine accidents, as the agency explained. JA274. And steady demeanor and good judgment is particularly important in Great Lakes pilotage, where pilots work with foreign vessels and foreign crews in the challenging conditions of designated waters. JA274. Pilots must remain calm and responsible even—indeed, especially—in stressful circumstances.

Plaintiff's conduct during his training raised red flags about his temperament and judgment under pressure. In one incident, plaintiff failed to tell the Coast Guard (or anyone else) that a tugboat that he had directed to push his vessel was severely damaged. In another incident, plaintiff found a piloting assignment to be particularly stressful and profanely shouted at the vessel's master, causing the

master to request a different pilot for the rest of the journey. Concerns about plaintiff's demeanor under stress were further confirmed by plaintiff's own communications with the Coast Guard during the administrative process, in which, among other things, plaintiff called agency officials "comical," "condescending," and "corrupt[]." JA208, 228, 231.

Plaintiff's appellate brief still does not recognize why these red flags are troubling and continues to attempt to deflect responsibility onto anyone but himself. He thereby confirms the agency's conclusion that his temperament and judgment are ill-suited to the high-stakes job of Great Lakes pilotage. The agency's conclusion does not rest on any factual disputes about what occurred in any given incident. The undisputed facts were enough for the agency to determine, in an exercise of its expert judgment, that it was unwilling to risk making plaintiff a fully registered Great Lakes pilot. Plaintiff identifies no basis on which he could be permitted to substitute his judgment for the agency's.

In making its decision, the agency permissibly took into consideration the negative recommendation of the private pilotage

association as "further input" confirming a determination the agency made using its independent judgment. JA273. The agency's reasonable judgment is supported by the record and should be upheld, as the district court correctly held.

II. Plaintiff's new private-nondelegation and First-Amendment claims are not properly presented in this appeal, as plaintiff failed to raise them below. In any event, those claims fail on the merits. The private pilotage association functions subordinately to the Coast Guard, in satisfaction of private nondelegation principles. Plaintiff asserts that the government itself must provide any training that the government may require as a pre-requisite for a government license. No authority supports that proposition. Nor are any First Amendment interests burdened by a government requirement that a trainee receive instruction from a trainer with whom the trainee may happen to disagree on certain public issues.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015). In examining an agency's decision, this Court "may not substitute [its]

30

judgment for [the agency's]" and instead "appl[ies] the [Administrative Procedure Act's] highly deferential standard," under which the Court may set aside the agency's decision "only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quotation marks omitted).

## ARGUMENT

### I.  The Coast Guard Acted Well Within Its Discretion In Declining To Register Plaintiff As A Great Lakes Pilot.

#### A.  The Agency Reasonably Declined To Take A Risk On Plaintiff's Insufficient Training And Poor Temperament.

The Coast Guard reasonably concluded on the basis of the administrative record that plaintiff (1) failed to complete his training on the particularly difficult waters of the St. Lawrence River and (2) does not possess the calm temperament and good judgment required for a Great Lakes pilot expected to operate in stressful bridge conditions. The Coast Guard concluded that either of these concerns warranted denial of plaintiff's application. *See* JA273.

**1.** *Incomplete training.*

To be eligible for registration, a candidate must, among other things, have "completed a course of instruction … prescribed by the

31

association authorized to establish the pilotage pool." 46 C.F.R.

§ 401.220(b)(2). The Association's training plan, as overseen and

approved by the Coast Guard, divides the required course of training

into two stages. In the first stage, a trainee obtains adequate experience

to obtain a limited and temporary registration to solo pilot on the

undesignated waters of Lake Ontario. JA135.

In the second stage, a trainee must gain adequate experience on

the particularly difficult waters of the St. Lawrence River to

demonstrate that he or she can be trusted to safely pilot on those waters

without supervision. JA135. A stage two trainee is required to "continue

to make trips in the designated waters" of the St. Lawrence River "in

the company of Registered Pilots" for two shipping seasons in order to

"work towards completion" of training requirements "which are specific

to the designated waters of the district" in order to demonstrate

competency to solo-pilot a vessel in those waters. JA135-36.

A typical second-stage training course consists of four round trips

on the river per shipping season (or eight in the course of the typical

two-season second stage of training). JA214-15. To qualify as a training

trip, the trip must not only be conducted in the presence of a registered

32

pilot but must also be evaluated by the registered pilot in order to
provide a basis on which to evaluate the trainee's performance. JA136
(requiring performance reports to be prepared on the basis of
"Evaluation Cards").

Like the Coast Guard-approved training plan, the Association's
charter draws a distinction between the first phase of training, leading
to limited registration for lake piloting, and the second phase "River
training program" "for the training" of such limited registrants "on the
restricted waters of District 1." JA142-43; *accord* JA144 (distinguishing
the "Lake Pool" of pilots from the "River Pool" of pilots who have
"completed the River training program" and are "full[y] regist[ered] for
the entirety of District 1").

The agency reasonably concluded that plaintiff never obtained
adequate river experience to complete the second stage of the course of
training. It is undisputed that plaintiff completed only "two, one-way
trips on the St. Lawrence River in the 22 months" he was in the second
training stage, only one of which was actually "observed by a
supervising pilot" and thus counted toward his training. JA293.
Plaintiff therefore has completed only one half of a full, supervised,

33

round trip on the St. Lawrence River. That falls far short of the typical
training course of four round trips per shipping season (or eight in two
years). JA214-15. And it undoubtedly fails to satisfy the requirement of
the Coast Guard-approved training plan that a stage two trainee, such
as plaintiff, "continue to make trips in the designated waters" of the St.
Lawrence River "in the company of Registered Pilots" during two
shipping seasons in order to clearly demonstrate competency to solo-
pilot a vessel in those particularly challenging waters. JA135. Indeed,
as the agency noted in its final decision, and as plaintiff does not
dispute, plaintiff has "never solo navigated a vessel" on the St.
Lawrence River, much less demonstrated his readiness to do so through
multiple successful supervised trips. JA271.

The Coast Guard noted that its conclusion found additional
support in the Association's recommendation. The agency explained
that "[a] letter of recommendation is an industry standard and the
method by which the three pilotage Great Lakes associations inform the
Director they are satisfied that a given deputy pilot has successfully
completed their respective Coast Guard approved training programs
and has the requisite skill and experience to safely solo-navigate a

34

vessel throughout the waters of their Districts." JA273. Indeed, the regulations mandate that, to aid the Coast Guard's consideration of an application, the pilotage association "shall submit to the Director in writing its recommendations together with its reasons." 46 C.F.R. § 401.220(c).

Satisfying this obligation, the Association stated its view that plaintiff had failed to complete his river training because he had completed too few supervised river trips to ensure that he could safely navigate those waters on his own. JA221-24. The agency did not err in taking that negative recommendation into account as "further input" corroborating the agency's already-stated conclusion. JA273; *accord* JA87 (initial agency decision) (explaining that the initial decisionmaker "would deny" registration "even with a positive endorsement" from the Association).

The district court thus correctly concluded that, "[f]or the Coast Guard to examine these facts and conclude, as it did, that" plaintiff "neither completed the [Association's] training plan, nor otherwise 'demonstrate[d] the proficiency and expertise required to safely solo pilot vessels through [the] challenging and dangerous designated

waters' of the St. Lawrence River, is surely not unreasonable." JA293

(third and fourth alterations in original) (quoting JA272).

**2.** *Poor temperament.*

Independent of the training requirement, the regulations

separately provide that "[n]o person shall be registered as a United

States Registered Pilot unless … [t]he individual is of good moral

character and temperate habits." 46 C.F.R. § 401.210(a)(3). As the Coast

Guard explained in detail, studies show that the "human factor," such

as "inability to cooperate with other crew members, and susceptibility

to stress," is "responsible for over 80% of accidents at sea." JA274

(quotation marks omitted). "[A]n overly self-confident" officer, "even

when cooperating with a resilient officer, can generate tension" on the

bridge, and "[a] belief in one's infallibility, together with aggression

towards other crewmembers, creates discomfort and suboptimal

functioning in the entire crew." JA274 (quotation marks omitted). Those

concerns are "even greater" in Great Lakes pilotage, as the agency

explained, because "English is likely to be a secondary language" for the

"unfamiliar crew of a foreign vessel." JA274.

36

The agency reasonably concluded that plaintiff did not have the calm and respectful demeanor under stress and the openness and candor that are necessary to work in the often-challenging interpersonal and physical circumstances of Great Lakes pilotage, where the stakes for life and property are high. The agency based that determination "upon the several incidents cited" in the initial denial. JA274. Those incidents, considered together and with particular weight on the bridge incident and plaintiff's emails, more than adequately support the agency's conclusion.

**a.** *The tugboat incident.*

While plaintiff was piloting a vessel in a relatively narrow channel, his vessel was pushed by the wind, causing it to "crowd[] the red channel buoys" marking the channel. JA218. During this operation, plaintiff directed several tugboats to ride alongside the vessel he was piloting. JA218. One of the tugs "backed into one of the red channel buoys as it was pushing" plaintiff's vessel "to keep her in the channel," resulting in "severe damage" that rendered the tug a "total loss." JA218.

The Association noted it was "unclear from the facts whether this incident was the result of" plaintiff's "failure to maintain control" of his

vessel "due to the wind conditions, some other reason attributable to" the tug, or a "combination of the two." JA218. What was clear however, was that plaintiff never reported this incident to the Association or the Coast Guard. The Coast Guard first became aware of the incident after a regional stakeholder meeting when the tug's Canadian owner raised the incident with the Coast Guard Director of Great Lakes Pilotage. JA218-19. "Whether [plaintiff] committed an act of negligence … will likely never be known because [he] did not properly report this incident, and therefore no detailed, real time investigation was able to be performed." JA219 n.2.

In a letter to the Association, plaintiff confirmed the basic facts discussed above and indicated his belief that the tug's driver "was not paying attention to the red channel buoy" while pushing plaintiff's vessel to keep it "safely in the channel." JA99. Plaintiff admitted he heard the tug's driver "on the radio indicating he was having trouble" after the incident, but plaintiff "did not contemplate making any notifications" because plaintiff's own vessel "never contact[ed] a channel marker." JA99-100.

Plaintiff eventually admitted that he "should have picked up the phone immediately" and apologized that his "lapse in communication" put the pilotage association in the "unenviable position" of learning about the incident from the Coast Guard, which only learned about it from the tug's foreign owner long after the fact. JA100. The Coast Guard's Director of Great Lakes Pilotage explained that plaintiff's "decision to withhold notification of this incident" was "deeply concerning" and "demonstrated a lack of acceptable judgement." JA86.

**b.** *The bridge incident.*

Plaintiff's deficient judgment was likewise illustrated by his heated argument with a master on the bridge of the master's ship. The master described the incident via email, explaining that plaintiff "was in a bad mood from the beginning" and "didn't cooperate[] well" from the moment he boarded the vessel. JA172. As the vessel approached a bridge on the way into port, the master was having a "routine communication" with his chief officer on deck, over the radio, about "the clearance on … either side[] of the vessel while passing between the piers." JA172. Plaintiff "badly shouted at [the master] for talking" while plaintiff was working. JA172. The master considered it "extremely

wrong on [plaintiff's] part to shout" at a master on the bridge of his own

ship but chose not to raise the issue immediately to avoid further

"disturb[ing] the pilot" on the approach into port. JA172. After the

vessel was docked, plaintiff "came [back] inside the bridge and

threatened [the master] in abusive language." JA173. The master

requested a new pilot be assigned for departure. JA173.

In a letter to the Association, plaintiff confirmed the basic facts of

this exchange while disputing some particulars. Plaintiff described the

master as "speak[ing] loudly" into his radio as the ship approached a

bridge, at which point "I raised my voice requesting quiet" because

plaintiff could not hear the quartermaster repeat back a course

command plaintiff had given him. JA100. The master "complied and the

bridge went silent." JA100. After the ship was docked and the bridge

was cleared, the master "loudly informed me he took exception with me

raising my voice." JA101. Plaintiff replied with "expletives" ("F-bombs,"

JA153) and told the master he lacked "situational awareness." JA101.

Plaintiff "openly admit[ted] and acknowledge[d]" to the Association,

after the Association raised the incident with him, that he "should have

handled the [bridge] situation better" and not "used expletives" with a ship's master on the master's own bridge. JA101.

The Coast Guard's initial decision denying registration explained that "the master-pilot relationship on the bridge" is "critical to navigational safety" and concluded that plaintiff's conduct in this incident "further demonstrates [his] clear lack of judgement and recognition of the role of the master as being in charge of the ship, and everyone aboard." JA86; *see* 46 U.S.C. § 9302(a)(1)(A) (specifying that a pilot is "subject to the customary authority of the master"). The agency's initial decision noted that these incidents were "clearly a concern" to the Association, JA86, whose president described the incidents as "extremely serious" and "unprecedented" for a second-stage trainee, JA75. The president could "not recall any other instance in which [the Association] received such a complaint from a vessel master." JA75. The initial agency decisionmaker explained that these incidents were also "deeply concerning" to the decisionmaker and demonstrated plaintiff's "lack of acceptable judgement." JA86.

The Coast Guard reasonably placed special weight on the bridge incident in concluding that plaintiff lacked the necessary temperament

to be a Great Lakes pilot capable of communicating cooperatively and effectively with a foreign crew of a foreign vessel in stressful circumstances. JA274.

**c.** *Additional evidence.*

As the agency correctly noted, its conclusion regarding plaintiff's poor temperament was confirmed by plaintiff's "increasingly antagonistic and aggressive tone of his numerous emails" to the Coast Guard. JA274.

In those emails, plaintiff complained that agency officials "would not debate with me," JA180; demanded that agency officials "prove me wrong," JA228; warned agency officials, "I won't ask again," JA203; mocked an agency official's analysis as "comical," JA208; lodged baseless accusations of an agency official's "unchecked collusion and corruption," JA228, "potential campaign finance conflicts," JA184, and "refus[al] to actually read" the Act, JA227; and accused the agency official of being "condescending," JA231. When plaintiff was asked for documentation regarding his claims to have completed his training, he repeatedly failed to provide the documentation and then provided only "unorganized, handwritten records for unspecified activity" which

42

"caused [agency] staff to expend precious time interpreting and organizing the information [plaintiff] provided." JA210.

Plaintiff's demeanor in his interactions with agency officials was consistent with his interactions with other pilots and ship officers. The Association reported "virtually unanimous feedback" from its members that plaintiff "has often been combative in routine business situations, very difficult to get along with, and often lacks basic decorum and personal skills." JA224. Plaintiff expressly "accept[ed]" the Association's "observation" about his lack of "professionalism, Bridge Resource & Anger Management skills." JA102; *accord* JA100 (plaintiff expressing annoyance that a vessel's master placed calls to other masters "asking their opinions on the safety of" a potential berthing solution "[d]espite [plaintiff's] recommendation" of that solution); Br. 43-44 (maintaining that vessel master "deserved[]" to be "reprimanded in public" by plaintiff).

Red flags were also raised by plaintiff's representations on his resume that "overstated [his] professional experience" to "bolster[] [his] credentials." JA87 (initial decision); JA300 n.6 (opinion). For example, plaintiff claimed that he served as a "pilot," full stop, for a range of

43

years, including time spent observing and despite the fact that he never progressed beyond a deputy pilot training status and never obtained full registration. JA86 (initial decision); *see* JA263-66 (plaintiff's deposition). Plaintiff also claimed that he "retired" from the U.S. Navy Reserve when in fact he was honorably discharged after having "never actually served a single day in uniform performing duties as an officer in the Naval Reserve." JA87 (initial decision); *see* JA95-97 (deposition). The distinctions between serving long enough to retire and being honorably discharged after having never performed duties in uniform as a reserve officer are not, as plaintiff has urged, "semantics" and "hair-splitting." JA42, 96.

Taking these incidents into account, the district court did not err in concluding that a "reasonable factfinder could have made the same finding as the agency" regarding plaintiff's lack of judgment and the temperament necessary to provide safe pilotage services on the Great Lakes. JA299 (quoting *Finberg v. U.S. Dep't of Agric.*, 6 F.4th 1332, 1336 (D.C. Cir. 2021)). That conclusion is particularly clear in light of this Court's longstanding practice of giving special weight to "the Coast Guard's expertise both in maritime safety and in deciding the most

44

efficient way to administer its licensing and discipline procedures."

*Collins v. National Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir.

2003).

>    **B.    Plaintiff's Contrary Arguments Disregard Regulatory Requirements And The Administrative Record.**

**1.** Plaintiff suggests that the stated reasons in the Coast Guard's

decision were a "pretext," Br. 27, 38, 42, 47, and that the decision

resulted from "unchecked collusion and corruption" between the

president of the Association and the Coast Guard's Director of Great

Lakes Pilotage, JA228.

A court's review of agency action is "limited to evaluating the

agency's contemporaneous explanation in light of the existing

administrative record," *Department of Commerce v. New York*, 139 S.

Ct. 2551, 2573 (2019), and plaintiff's baseless allegations of corruption

do not overcome the presumption that federal officials "have properly

discharged their official duties" absent "clear evidence to the contrary,"

*United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926); *see*

*also United States v. Morgan*, 313 U.S. 409, 421-22 (1941) (explaining

that courts should not go beyond the record and "probe the mental

processes" of administrative decisionmakers (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938))); *Environmental Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981) ("The focal point for judicial review should be the administrative record."); *Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *1 (D.C. Cir. Mar. 29, 2022) (per curiam) (rejecting contention that agency's stated reasons were "a pretext for other, invalid motivations").

Plaintiff's allegations were investigated and rejected by a senior Coast Guard official who "found no evidence of collusion or conspiracy between" the Association's president and the Coast Guard Director. JA129. The president of the Association explained, for example, that an alleged "vacation" by the Director to Association headquarters, *see, e.g.*, JA238, was actually a trip to oversee the Coast Guard's audit of the Association, during which the Director stayed in a tent outside the headquarters during a storm and declined an invitation to use an open pilot's room specifically to avoid any appearance of impropriety, JA73-74.

**2.** None of plaintiff's arguments regarding his temperament negate the reasonableness of the Coast Guard's judgment.

46

Plaintiff mistakenly asserts that "[t]he Coast Guard never" looked into the relevant facts of the tugboat and bridge incidents and "never even asked" plaintiff "for his side of the story." Br. 39. Communications from the agency to plaintiff, contained in the administrative record, show otherwise. *See, e.g.*, JA157 ("Please be patient as we complete our review of the facts" surrounding the incidents the Association reported to the agency.); JA182 ("I directed [a Coast Guard official] to look into this situation."). As the district court explained, plaintiff "had, and took, multiple opportunities to present his own versions" of the incidents at issue. JA301; *see, e.g.*, JA159-62 (plaintiff's emails to Director); JA108-11 (administrative appeal of initial decision); JA99-103 (plaintiff letter to Association responding to incident descriptions).

Plaintiff fails to recognize the seriousness of the tugboat incident and the bridge incident and what they reveal about his judgment and temperament—concerns that are apparent again in his emails to agency staff. *See* Br. 39-44, 46-48. As the district court recognized, "[t]he Coast Guard evaluated the accounts before it and ultimately concluded that it was not willing to jeopardize maritime safety by registering a pilot whose temperament, in the agency's experience, increases 'risk to the

47

vessel and environment.'" JA301 (quoting JA274). Plaintiff identifies no error in how the Coast Guard conducted that evaluation, and he offers no basis on which a court could substitute its predictive judgment about acceptable risk for that of the agency.

Plaintiff misses the mark in stressing (Br. 39-40) that, in his view, he was not responsible for the loss of the tugboat after it collided with a channel-marking buoy. At the time of the collision, the tug—on plaintiff's direction—was pushing plaintiff's vessel to keep it on the correct side of the buoy. Pilots are required by regulation to report any "marine accident which occurs while" the pilot "is in the service of a vessel" on the Great Lakes "as soon as possible" after the event, 46 C.F.R. § 401.260(a)—regardless of fault. All marine accidents are of concern to the Coast Guard, not only those in which a pilot considers himself to have been at fault. Reporting marine accidents allows the agency to track all potential threats to the continued safety of Great Lakes pilotage, whatever their source, to reach out to any potential stakeholders, and to evaluate proactively what steps may be appropriate in light of an accident. That important process did not occur in a timely fashion here, where the tugboat incident first came to the

48

Coast Guard's attention many months after the fact and only because the tug's Canadian owner was sufficiently concerned about the potential role of an American pilot in the accident that the owner personally raised the incident with the Director of Great Lakes Pilotage. JA182.

Plaintiff's assertion that he had no reason to suspect an accident had occurred is flatly at odds with the record. As noted, plaintiff has admitted he knew he had directed the tugboat to push the vessel to keep her on the correct side of several buoys that he knew the vessel was crowding, and he knew that the tug "was having trouble" shortly thereafter. JA99. The agency would be entitled to conclude, on the basis of those facts, that plaintiff had failed to report a marine accident in violation of the regulation. *See* JA86.

In any event, the Coast Guard's decision to not register plaintiff did not turn on violation of the regulation, as such. The agency explained that the uncontroverted facts "demonstrated a lack of acceptable judgement" in deciding not to report this troubling event, which plaintiff acknowledged he should have reported, JA86, and his failure to do so raised serious concerns about his "[un]professional temperament" and his "belief in [his] infallibility," JA274.

Plaintiff's brief on appeal offers the same type of assertions that concerned the Coast Guard in determining that registering him would pose an undue safety risk. The brief characterizes plaintiff's acknowledgment that he should have reported the incident as merely a placatory offering. Br. 41. But the agency is entitled to take plaintiff's on-the-record statements seriously. The brief further asserts that "[i]t is hard to imagine that anyone in Captain Hight's shoes would have thought himself obligated to file a report that said, simply, 'I heard fourth-hand that a vessel near me a few days ago sustained some kind of damage.'" Br. 40-41. That cavalier description of a pilot's responsibility for reporting incidents involving tugboats providing service at his direction disregards plaintiff's contemporaneous basis for knowing the tug "was having trouble." JA99. It likewise disregards a pilot's duty to report an accident as soon as possible after learning of an accident, even if that is a few days after it occurs. And, most troublingly, it reflects the avoidance of responsibility that contributed to the Coast Guard's decision not to register plaintiff in the first place.

Plaintiff's attempt to downplay the seriousness of the bridge incident as a "workplace dispute" of no significance (Br. 44) is similarly

unavailing. "[D]emean[ing] [the master's] authority as master and person with ultimate responsibility for the safety of the vessel" is "dangerously unprofessional because it substantially degrades the master-pilot relationship on the bridge that is so critical to navigational safety" and "further demonstrates" plaintiff's "clear lack of judgment." JA86 (initial decision).

Plaintiff identifies no authority supporting his assertion that an agency conducting an informal adjudication based on written materials, such as the one at issue here, may not rely on the written account of the master himself, contained in an email of undisputed authenticity, prepared just three months after the incident, and instead must "follow-up with the master" in some unspecified way. Br. 44. The master was not "totally unknown" to Great Lakes pilotage, Br. 43, but rather the master of a vessel that "routinely transits District 1 waters," JA86. His account was not "cryptic," Br. 44, but relatively specific and consistent with plaintiff's own account, *see* JA172-73 (master's account), JA160-61 (plaintiff's account). Plaintiff was free to dispute the master's first-person account and defend his behavior. Instead, plaintiff recognized that he should have "apologized for any perceived disrespect," JA161,

and accepted the observation that his "Anger Management skills requir[e] improvement," JA102.

The district court thus did not err in concluding that the "description of the [bridge] incident to which all parties apparently agree," JA300—that plaintiff "reprimanded in public" the master of a vessel on the master's own bridge and yelled profanities, Br. 43-44—properly contributed to the agency's assessment of plaintiff's unduly combative temperament under stress. The agency concluded that it was the "heated argument on the bridge"—not every detail of the event as described in the master's email—that contributed to the agency's conclusion about his poor temperament. JA274. That characterization tracked plaintiff's own description of a "heated exchange with a master," JA106, and his admission to having poor anger-management skills, JA102. The agency thus had no need to "credit one party over another," much less explain such a choice. Br. 44.

Plaintiff does not attempt to dispute the agency's characterization of his "antagonistic and aggressive" emails to agency staff during administrative proceedings. Br. 46-48 (quoting JA274). He offers the excuse that he was "frustrated" by the administrative proceedings.

52

Br. 47. But plaintiff's demeanor under stress is part of the problem the agency identified. And plaintiff's brief on appeal does nothing to undermine the reasonableness of the agency's conclusion that plaintiff "does not possess the calm demeanor and professional temperament necessary" to operate in "a high-stakes, dynamic environment" of Great Lakes pilotage. JA274. This Court could affirm on the basis of the agency's reasonable conclusion regarding plaintiff's temperament alone. *See* JA274 (identifying poor temperament "[a]s an additional basis for my decision").

**3.** Plaintiff attempts to cast doubt on the applicable training requirement but ultimately does not appear to dispute the merits of the agency's conclusion that he did not finish training on the St. Lawrence River. The requirement to complete a Coast Guard-approved course of instruction over the waters for which registration is sought was not plucked from "somewhere out there in the ether," Br. 32 n.3; it is an express precondition to registration under the agency's regulations, 46 C.F.R. § 401.220(b)(2).

Nor is the requirement so general as to be satisfied by any minimal amount of training. Plaintiff correctly notes that the written

training plan at issue here does not identify a specific number of river trips that all applicants must invariably complete during the second phase of training. Br. 32. The plan instead requires that second-stage trainees "continue to make trips in the designated waters of the pilotage district" sufficient to demonstrate competence to be registered as a pilot on those waters. JA135. To meet that standard, instructors generally look for second-stage trainees to complete four round trips per year, for a total of eight over two years. JA214-15. It is undisputed that plaintiff made only a single, one-way trip on the river performing the duties of a pilot under the supervision of a registered pilot during his two seasons in the second phase of the training program. JA280; Br. 32. And plaintiff does not argue that it was unreasonable for the agency to decide that this half-round trip on the river did not meet the written requirement to "make trips"—plural—"in the designated waters of the pilotage district," much less a sufficient number of trips to demonstrate competence to be registered to solo pilot on those waters. JA135.

On appeal, plaintiff urges that "[t]his Court does not need to decide what kind of river training" is required for registration, Br. 38, and instead contends that the agency was required to explain alleged

"inconsistent treatment" of his application compared with other trainees who allegedly lacked adequate river training but were nonetheless registered. Br. 33-38. That argument fails for two reasons.

First, plaintiff does not identify any trainee who was granted full registration on all the waters of district one, including the St. Lawrence River, despite having completed only a half round trip on the river during the second stage of training, or any comparably small figure. That alone should foreclose his argument regarding inconsistent treatment. Indeed, plaintiff nowhere specifies how many river round trips *any* purported comparator had at registration.

An agency "is not required to distinguish every precedent cited to it by an aggrieved party," and an agency may omit an express distinction unless "a party makes a significant showing that analogous cases have been decided differently." *Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 300 (D.C. Cir. 2012) (quotation marks omitted); *see ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018) (explanation required where cases "appear virtually indistinguishable"); *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 22 (D.C. Cir. 2014) (explanation required where agency decisions

55

regarding "this very same tariff" led to "the exact opposite answer");

*Grayscale Invs., LLC v. SEC* 82 F.4th 1239, 1245-46 (D.C. Cir. 2023)

(requiring explanation if cases are "similar … across the relevant

regulatory factors"). Plaintiff fails to make any showing of inconsistent

treatment that would require an explanation by the agency.

At times, plaintiff appears to suggest that no prior trainee could

possibly have completed *any* river training at the time of registration

because, plaintiff asserts, trainees "were not *allowed*" to undergo such

training until after they were fully registered pilots. Br. 33. As plaintiff

does not dispute, he was credited with a half-round-trip on the river

under the supervision of a registered pilot in the second stage of his

training. JA205, 295. Record evidence also showed that other trainees

have not been "issued any kind of waiver of these [river training]

requirements" and that there is "[]sufficient opportunity to make the

required round trips" as a trainee. JA224. The Association's corporate

charter is consistent with that conclusion. It provides that newer

trainees cannot be trained on the river before longer-serving trainees

who similarly lack full registration for the river. JA143. It does not, as

plaintiff mistakenly contends, Br. 33-34, prohibit river training until

full registration is achieved. As the agency explained, it declined to "depart from the standard training and qualification process used by … the Coast Guard in the Great Lakes" and grant registration to an applicant lacking adequate river training. JA272.

Plaintiff's appellate brief asserts that one trainee "underwent the exact same training" as plaintiff and was nonetheless registered. Br. 36. That assertion is not supported by plaintiff's sworn declaration, which addresses a separate issue. There, plaintiff speculates only that, with respect to the minimum-trips requirement, the other trainee and plaintiff "had *approximately* the same number of river trips" as observers during or before the "*first 6 months of training*." JA256 (emphasis added). Plaintiff offers no evidence that, after he progressed to the second stage of training, the alleged comparator made anything like the half-round trip on the river that plaintiff made performing the duties of a pilot under the supervision and evaluation of a registered pilot. To the contrary, plaintiff ultimately admits that the comparator completed multiple additional river trips during his second phase of training before seeking and receiving full registration. Br. 36-37.

57

Plaintiff queries whether he "could not still go back to complete his river training" as he says the other trainee did before the agency considered whether to register him. Br. 36. The final agency action at issue here denied plaintiff's improper request for registration at a time when he lacked adequate river training, and the agency did not err in denying registration on that basis. The agency's final decision regarding that request for registration did not address, and this case presents no question concerning, whether or not plaintiff should be permitted additional training opportunities and a further attempt to obtain registration. *See* JA135-36 (termination of training requires Coast Guard approval). In sum, plaintiff has failed to establish that the agency, in denying registration on the basis of plaintiff's inadequate river training, treated him inconsistently with any other trainee with similarly inadequate river training.

Second, even if plaintiff could identify a comparator who had been registered despite similarly inadequate river training, such a showing would not demonstrate that the agency was required to grant registration here. This Court has explained that even if a party makes a threshold showing of inconsistent treatment, the allegedly inconsistent

cases must have been decided by the person or body exercising the authority of the agency at its most senior level in order to trigger the requirement that the agency distinguish contrary precedent. That is so because "even if [certain] cases were found to evince internal inconsistency at a subordinate level, the [agency] itself would not be acting inconsistently." *Amor Family Broad. Grp. v. FCC*, 918 F.2d 960, 962 (D.C. Cir. 1990); *see also, e.g.*, *MacLeod v. ICC*, 54 F.3d 888, 891 (D.C. Cir. 1995) ("[T]he results reached by the staff in the earlier decisions are irrelevant to our analysis of the Commission's fidelity to its own precedents."); *Comcast Corp. v. FCC*, 526 F.3d 763, 770 (D.C. Cir. 2008) ("[U]nchallenged staff decisions are not Commission precedent, and agency actions contrary to those decisions cannot be deemed arbitrary and capricious.").

The senior agency official who ultimately denied plaintiff's request for registration did so under the delegated authority of the Commandant of the United States Coast Guard after plaintiff sought further administrative review of the initial denial by a subordinate Coast Guard official. *See* JA269; 46 C.F.R. § 1.03-50. Plaintiff does not contend that this senior-most decisionmaker made any registration

59

decisions regarding any other applicants that are inconsistent with his

decision regarding plaintiff. Accordingly, under this Court's precedents,

no explanation of apparent inconsistent treatment was required.

## II. Plaintiff's Private-Nondelegation And First-Amendment Claims Are Not Properly Presented And Fail On The Merits.

**A. 1.** Plaintiff contends that the Coast Guard, in determining

whether to register plaintiff, "defer[ed] to the Association completely, in

violation of the nondelegation doctrine." Br. 48. That is incorrect. The

Coast Guard regularly exercises its own judgment to decide a wide

range of issues contrary to the Association's preferences. *See, e.g.*,

*Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 324 (D.C. Cir.

2011) (agency had required association to dispatch non-member pilot);

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp.

3d 197, 200 (D.D.C. 2015) (agency set lower pilotage rate than

association proposed).

Here, too, "[t]he record shows that the Coast Guard *did* exercise

its own judgment in denying registration," as the district court correctly

held. JA297. "[T]he fact that [the agency] ultimately agreed with the

[Association's] recommendation is no evidence to the contrary." JA297.

60

The Coast Guard "repeatedly sought to corroborate the [Association's] conclusions with independent proof, including with [plaintiff's] own records and accounts." JA298; *see, e.g.*, JA166 (email explaining that the Coast Guard was "reviewing [plaintiff's] input as well as the input from [the] pilot association"); JA182 (email explaining that the Coast Guard was in "the process of gathering facts and evaluating [the] veracity" of allegations regarding the tug incident); JA183 (email explaining the Coast Guard's preliminary determination that plaintiff had not "completed [his] training" and further explaining that "[i]f I am in error, and you can demonstrate, with records, that you have completed all of your training, I will reconsider my position"); JA190 (email asking plaintiff to send the Coast Guard "signed records of your trips" to consider alongside the Association's submissions).

Plaintiff "points to *nothing* in the [agency] decision currently under review or the decision-making process leading up to it that suggests the Coast Guard treated the [Association's] recommendation as dispositive." JA298. To the contrary, the final decision explains that the agency was free to "consider[] the [Association's] recommendation." JA272. The agency accepted that recommendation as "further input"

61

regarding determinations that the agency made on its own, on the basis of the record, regarding plaintiff's poor temperament and incomplete river training, JA273; *accord* JA87 (initial decision) ("Based upon your lack of integrity and judgement, I would deny your request even with a positive endorsement."). In sum, as the district court correctly recognized, "the Coast Guard, not [the Association], was the one running the show" in denying plaintiff's request for registration. JA298.

**2.** For the first time in this case, plaintiff also contends that the requirement that he actually train on the St. Lawrence River under the supervision of a registered pilot reflects an impermissible delegation of authority. Plaintiff urges that "[t]here is no way to get those trips other than working with the Association, which gives the Association an effective veto over any prospective pilot." Br. 52. Plaintiff did not make that argument in district court and raised private-nondelegation arguments only with respect to the issues addressed immediately above: the agency's assertedly absolute deference to the Association's recommendation and factual contentions. *See* Dkt. 28, at 30-36; Dkt. 36, at 15-21. The district court correctly did not address this forfeited argument. *See McAfee v. U.S. FDA*, 36 F.4th 272, 277 (D.C. Cir. 2022).

62

In any event, plaintiff misunderstands private nondelegation principles. For nearly 100 years, the Supreme Court and the courts of appeals have recognized that "a private entity may aid a public federal entity that retains authority" over it. *Oklahoma v. United States*, 62 F.4th 221, 228 (6th Cir. 2023), *petition for cert. filed*, No. 23-402 (U.S. Oct. 13, 2023). In *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), for example, the Supreme Court upheld a statute under which local boards consisting of private coal producers chosen by private coal producers "operate[d] as an aid to the [National Bituminous Coal] Commission but subject to its pervasive surveillance and authority." *Id.* at 388. The Commission was "empowered to fix minimum prices" for coal following a procedure in which the private boards would "propose minimum prices," which "may be approved, disapproved, or modified by the Commission." *Id.* Addressing that statute, the Supreme Court concluded that it was "unquestionably valid" because "members of the [private boards] function subordinately to the [governmental] Commission," which "has authority and surveillance over the activities" of the private boards. *Id.* at 399. Since *Adkins*, "[i]n case after case, the courts have upheld" statutory and regulatory schemes in which an

63

agency reviews and approves rules developed by private entities and reviews those entities' decisions applying those rules, "reasoning that the [agencies'] ultimate control over the rules and their enforcement makes the [private organizations] permissible aides and advisors." *Oklahoma*, 62 F.4th at 229.

The Coast Guard's regulatory scheme and its supervision of private pilotage associations leave no basis for plaintiff's newly minted argument. The Coast Guard decides whether to authorize, decline to authorize, or revoke the authorization of private pilotage associations. 46 U.S.C. § 9304(a); *accord* 46 C.F.R. §§ 401.320, 401.335. The Coast Guard "prescribe[s] regulations for the[] operation and administration" of pilotage associations. 46 U.S.C. § 9304(b); *accord* 46 C.F.R. § 401.320(d). The Coast Guard reviews and approves or rejects (and requires modification to) pilotage associations' training plans. 46 C.F.R. § 402.220(b). The Coast Guard prescribes the standards of competency applicants for registration must demonstrate and determines whether applicants have met those standards. 46 U.S.C. § 9303(a); 46 C.F.R. §§ 401.200-.260. Under Coast Guard-approved training plans, the Coast Guard is ultimately in charge of whether a trainee continues in training

or not: "A pilot association may not terminate an Applicant Pilot without the concurrence of the Director." JA135; s*ee also* JA136 (demotion from deputy pilot to applicant pilot also requires Coast Guard approval). And the Coast Guard ultimately decides whether to dispatch pilots to provide pilotage services even if those pilots are not members of or are not dispatched by a pilotage association.
46 C.F.R. § 401.720(b); *see Menkes*, 637 F.3d at 331.

Nor are delegation concerns raised by a requirement that an applicant for a government license or certification demonstrate adequate training, regardless of whether such training is in practice available only from private entities. There is no constitutional requirement that the government itself must provide any training that the government has made a prerequisite to obtaining a government license. Plaintiff identifies no contrary authority. He identifies no basis for departing from the long tradition dating back to the Founding of private pilotage training and dispatching, subject to review by the agency that is ultimately in charge. *See supra* pp. 3-6. And he identifies no reason why a person seeking to be registered to provide pilotage services in district one should not have to complete a course of training

with those who are most "intimately familiar with the local waters" in district one, *Kotch v. Board of River Port Pilot Comm'rs*, 330 U.S. 552, 557-58 (1947), and who form the sole pilotage pool in district one, *Menkes*, 637 F.3d at 331.

That the government has exercised its undisputed power over registration and training requirements in a particular way—to require that an applicant complete Coast Guard-approved training with a Coast Guard-approved trainer before being eligible for Coast Guard registration—only underscores the extent to which applicants, trainees, pilots, and pilotage associations all "function subordinately" to the Coast Guard, which retains "authority and surveillance over the[ir] activities." *Adkins*, 310 U.S. at 399.

**B.** Finally, plaintiff briefly argues that the training requirement violates the First Amendment. Br. 55. That argument fails for two reasons.

First, the argument is forfeited. Plaintiff did not raise a First Amendment challenge to the training requirement in district court. *See* Dkt. 28, at 36-41; Dkt. 36 at 21-23. There, plaintiff instead contended that "once [he] becomes a registered pilot," Dkt. 28, at 41, it would

66

violate the First Amendment to require that he buy an equity stake in
the Association to be eligible to provide pilotage services, *see id.* at 37.
This Court rejected that argument in *Menkes*, 637 F.3d at 334-35,
relying in part on Supreme Court caselaw upholding state bar
membership requirements, *Keller v. State Bar of California*, 496 U.S. 1,
4 (1990). The Supreme Court has recently reaffirmed the vitality of that
caselaw, explaining that it is "wholly consistent" with later changes in
the caselaw regarding union fees. *Harris v. Quinn*, 573 U.S. 616, 655
(2014). In any event, the district court here, like the district court in the
prior litigation, correctly held that plaintiff's challenge regarding what
might be required if plaintiff were to be registered is not ripe because
plaintiff was not registered. JA288; *Hight v. U.S. Dep't of Homeland
Sec.*, 533 F. Supp. 3d 21, 31 n.3 (D.D.C. 2021). Plaintiff does not
challenge that holding on appeal. Instead, for the first time in this case,
plaintiff challenges the training requirement. This Court should decline
to entertain that forfeited argument. *McAfee*, 36 F.4th at 277.

Second, even if it were properly presented, the challenge to the
training requirement would be without merit. The First Amendment is
not implicated when, consistent with longstanding tradition dating to

67

the Founding, the states and the Coast Guard require that persons

seeking registration as a pilot on particular waters must first complete

a course of training provided by the group of registered pilots that is

authorized to provide pilotage services in those waters. Plaintiff

identifies no precedent suggesting that First Amendment concerns arise

whenever a trainee may disagree with the expressive activities of a

trainer (such as the Association's views regarding the proper rates the

agency should set for compensating registered pilots for their services).

In *Janus v. American Federation of State, County, & Municipal*

*Employees, Council 31*, 585 U.S. 878 (2018), the only decision plaintiff

offers in support of this argument, the statute at issue compelled a

public employee to pay a union, of which the employee was not a

member and with whose public speech he disagreed, a pro rata share of

the cost for the union to conduct expressive activity as the exclusive

representative of the employee's bargaining unit. *Id.* at 891-930. The

Court explained that "[c]ompelling individuals to mouth support for

views they find objectionable violates" the First Amendment, *id.* at 892;

that "[c]ompelling a person to *subsidize* the speech of other private

speakers raises … First Amendment concerns," *id.* at 893; and that the

68

state had not adequately justified that imposition on First Amendment interests in that case, *id.* at 895-916.

   *Janus* has no bearing on the analysis here. Plaintiff does not allege that a trainee is compelled to subsidize the speech of the private pilotage association as a condition of receiving pilot training. And neither *Janus* nor any other case of which we are aware supports the notion that simply being trained by someone with whom the trainee disagrees on various issues would trigger any kind of First Amendment scrutiny.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
   *Principal Deputy Assistant*
   *Attorney General*

MATTHEW M. GRAVES
   *United States Attorney*

MARK B. STERN
 */s/ Joseph F. Busa*
JOSEPH F. BUSA
   *Attorneys, Appellate Staff*
   *Civil Division*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-1754*
   *Joseph.F.Busa@usdoj.gov*

May 2024

70

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,997 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joseph F. Busa*

Joseph F. Busa
Counsel for U.S.
Government Appellees

# CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Joseph F. Busa*

Joseph F. Busa
Counsel for U.S.
Government Appellees

**ADDENDUM**

# TABLE OF CONTENTS

**Great Lakes Pilotage Act of 1960, 46 U.S.C. § 9301 et seq.**

§ 9302.................................................................................................A1

§ 9303.................................................................................................A1

§ 9304.................................................................................................A2

**Great Lakes Pilotage Regulations, 46 C.F.R. Part 401.**

§ 401.210...........................................................................................A3

§ 401.211...........................................................................................A4

§ 401.220...........................................................................................A4

§ 401.260...........................................................................................A5

§ 401.320...........................................................................................A6

§ 401.340...........................................................................................A7

§ 401.700...........................................................................................A8

§ 401.710...........................................................................................A8

§ 401.720...........................................................................................A9

**46 U.S.C. § 9301 et seq. Great Lakes Pilotage Act of 1960**

**§ 9302. Great Lakes pilots required**

(a)

(1) Except as provided in subsections (d), (e), and (f) of this section, each vessel of the United States operating on register and each foreign vessel shall engage a United States or Canadian registered pilot for the route being navigated who shall—

(A) in waters of the Great Lakes designated by the President, direct the navigation of the vessel subject to the customary authority of the master; and

(B) in waters of the Great Lakes not designated by the President, be on board and available to direct the navigation of the vessel at the discretion of and subject to the customary authority of the master.

(2) The President shall make water designations under this subsection with regard to the public interest, the effective use of navigable waters, marine safety, and the foreign relations of the United States.

…

**§ 9303. United States registered pilot service**

(a) The Secretary shall prescribe by regulation standards of competency to be met by each applicant for registration under this chapter. An applicant must—

(1) have a license as master, mate, or pilot issued under section 7101 of this title;

(2) have acquired at least 24 months licensed service or equivalent experience on vessels or integrated towing vessels and tows of at least 4,000 gross tons as measured under section 14502 of this title, or an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title, operating on the Great Lakes or oceans, with a minimum of 6 months of that service or experience having been on the Great Lakes; and

A1

(3) agree that, if appointed as a United States registered pilot, the applicant will be available for service when required.

(b) The Secretary shall issue to each registered pilot under this chapter a certificate of registration describing the areas within which the pilot may serve. The pilot shall carry the certificate when in the service of a vessel.

(c) The Secretary shall prescribe by regulation the duration of validity of registration.

(d) The Secretary may prescribe by regulation the conditions for service by United States registered pilots, including availability for service.

(e) Subject to sections 551–559 of title 5, the Secretary may suspend or revoke a certificate of registration issued under this section if the holder fails to comply with a regulation prescribed under this chapter. Suspension or revocation of the holder's license under chapter 77 of this title includes the holder's certificate of registration.

(f) The Secretary shall prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services. The Secretary shall establish new pilotage rates by March 1 of each year. The Secretary shall establish base pilotage rates by a full ratemaking at least once every 5 years and shall conduct annual reviews of such base pilotage rates, and make adjustments to such base rates, in each intervening year.

(g) The Secretary shall ensure that a sufficient number of individuals are assigned to carrying out subsection (f).

## § 9304. Pilotage pools

(a) The Secretary may authorize the formation of a pool by a voluntary association of United States registered pilots to provide for efficient dispatching of vessels and rendering of pilotage services.

(b) For pilotage pools, the Secretary may—

(1) limit the number of the pools;

(2) prescribe regulations for their operation and administration;

(3) prescribe a uniform system of accounts;

(4) perform audits and inspections; and

A2

(5) require coordination on a reciprocal basis with similar pool arrangements authorized by the appropriate agency of Canada.

…

## 46 C.F.R. Part 401. Great Lakes Pilotage Regulations

## § 401.210. Requirements and qualifications for registration

(a) No person shall be registered as a United States Registered Pilot unless:

(1) The individual holds a license or MMC endorsed as a master, mate, or pilot, issued under the authority of the provisions of Title 52 of the Revised Statutes, and has acquired at least twenty-four months service as a licensed or credentialed officer or comparable experience on vessels or integrated tugs and tows, of 4,000 gross tons, or over, operating on the Great Lakes or oceans. Those applicants qualifying with ocean service must have obtained at least six months of service as a licensed or credentialed officer or comparable experience on the Great Lakes. Those applicants qualifying with comparable experience must have served a minimum of twelve months as a deck officer under the authority of their license or MMC.

(2) The individual is a citizen of the United States.

(3) The individual is of good moral character and temperate habits.

(4) The individual is physically competent to perform the duties of a U.S. Registered Pilot and meets the medical requirements prescribed by the Commandant.

(5) The individual has not reached the age of 70.

…

(7) The individual agrees to be available for service under the terms and conditions as may be approved or prescribed by the Commandant.

(8) The individual has complied with the requirements set forth in § 401.220(b) for Applicant Pilots if applying for registration for waters in which a pilotage pool is authorized.

(9) The individual agrees to comply with all applicable provisions of this part and amendments thereto.

…

## § 401.211 Requirements for training of Applicant Pilots

(a) The Director shall determine the number of Applicant Pilots required to be in training by each Association authorized to form a pool in order to assure an adequate number of Registered Pilots. No Applicant Pilot shall be selected for training unless:

(1) The individual meets the requirements and qualifications set forth in paragraphs (a) (1) through (4), (6), (7), and (9) of § 401.210.

(2) The individual shall not have reached the age of 60.

(3) The individual possesses a radar observer competency certificate or equivalent U.S. Coast Guard endorsement.

…

(c) The Director shall approve the United States Registered Pilots that are designated by the authorized pilot organization to provide training to those pilots that are in training to be registered pilots.

…

## § 401.220 Registration of pilots

(a) The Director shall determine the number of pilots required to be registered in order to assure adequate and efficient pilotage service in the United States waters of the Great Lakes and to provide for equitable participation of United States Registered Pilots with Canadian Registered Pilots in the rendering of pilotage services. …

…

(b) Registration of pilots shall be made from among those Applicant Pilots who have (1) completed the minimum number of trips prescribed by the Commandant over the waters for which application is made on oceangoing vessels, in company with a Registered Pilot, within 1 year of

A4

date of application, (2) completed a course of instruction for Applicant Pilots prescribed by the association authorized to establish the pilotage pool, (3) satisfactorily completed a written examination prescribed by the Commandant, evidencing his knowledge and understanding of the Great Lakes Pilotage Regulations, Rules and Orders; the Memorandum of Arrangements, Great Lakes Pilotage, between the United States and Canada; and other related matters including the working rules and operating procedures of his district, given at such time and place as the Commandant may designate within the pilotage district of the Applicant Pilot.

(c) The Pilot Association authorized to establish a pool in which an Applicant Pilot has qualified for registration under paragraph (b) of this section shall submit to the Director in writing its recommendations together with its reasons for the registration of the Applicant.

(d) Subject to the provisions of paragraphs (a), (b), and (c) of this section, a pilot found to be qualified under this subpart shall be issued a Certificate of Registration, valid for a term of five (5) years or until the expiration of his master's, mate's or pilot's endorsement issued under the authority of Title 52 of the Revised Statutes or until the pilot reaches age 70, whichever occurs first.

(e) The Director may, when necessary to assure adequate and efficient pilotage service, issue a temporary certificate of registration for a period of less than 1 year to any person found qualified under this subpart regardless of age.

…

## § 401.260 Reports

(a) A marine accident which occurs while a U.S. Registered Pilot is in the service of a vessel in U.S. or Canadian waters of the Great Lakes shall be reported by the Registered Pilot to the Director as soon as possible, but not later than 15 days after the accident. The report shall name and describe the vessel or vessels involved, and shall describe the accident, including type of accident, location, time, prevailing weather, damage to the vessel or vessels or property, and injury to persons or lives lost. This report does not relieve the pilot of responsibility for submitting any report required by other government agencies of the United States or Canada.

…

## § 401.320 Requirements and qualifications for authorization to establish pools

No voluntary association shall be authorized to establish a pool unless:

(a) The Director determines that a pool is necessary for the efficient dispatching of vessels and the providing of pilotage services in the area concerned.

(b) The stock, equity, or other financial interests coupled with voting rights or exercise of any right of control in the management of the voluntary association is held only by member Registered Pilots registered pursuant to § 401.200, § 401.210, or § 401.220(e), excluding Applicant Pilots.

(c) The voluntary association establishes that it possesses the ability, experience, financial resources, and other qualifications necessary to enable it to operate and maintain an efficient and effective pilotage service.

(d) The voluntary association agrees that:

(1) Pilotage services will be provided on a first-come, first-serve basis to vessels giving proper notice of arrival time or pilotage service requirements, to the pilotage station, except that pilots will not be required to board vessels which do not provide safe boarding facilities;

(2) It will submit working rules for approval of the Commandant;

(3) It will adopt and use the Uniform System of Accounts, part 403 of this chapter, and such other accounting procedures and reports as may be prescribed by the Commandant;

(4) It will be subject to audit and inspection by the U.S. Coast Guard and will submit by April 1 of each year an unqualified long form audit report for the preceding year prepared by an Independent Certified Public Accountant, performed in accordance with Generally Accepted Auditing Standards promulgated by the American Institute of Certified Public Accountants.

(5) It will be subject to such other provisions as may be prescribed by the Director governing the operation of and the costs which may be charged in connection with the pools;

(6) It will coordinate on a reciprocal basis its pool operations with similar pool arrangements established by the Canadian Government and pursuant to the provisions of the United States-Canada Memorandum of Arrangements, Great Lakes Pilotage, or any other arrangements established by the United States and Canadian Governments.

…

## § 401.340 Compliance with working rules of pools

(a) United States or Canadian registered pilots utilizing the facilities and dispatching services of any authorized pool shall comply with its working rules approved under § 402.320, except to the extent inconsistent with the dispatch orders of the Director under § 401.720(b), and with other rules of the pool that are related to those facilities and services.

(b) The voluntary associations of U.S. Registered Pilots authorized to establish a pilotage pool may require a U.S. Registered Pilot to execute a written authorization for the pool to bill for services, deduct authorized expenses, and to comply with the working rules and other rules of the pool relating to such facilities and services. Facilities and services of the pool may be denied to any U.S. Registered Pilot who fails or refuses to execute such authorizations.

(c) U.S. Registered Pilots who fail to execute such an authorization shall not be considered members of the U.S. pool, and shall not be entitled to reciprocal dispatching and related services by United States and Canadian pilotage pools as provided for by the Memorandum of Arrangements. A U.S. Registered Pilot who fails or refuses to avail himself of the established facilities and services shall be considered as not being continuously available for service pursuant to section 4(a) of the Great Lakes Pilotage Act of 1960 (46 U.S.C. 216 through 216i) and his agreement executed on the Application for Registration as a U.S. Registered Pilot, and may be subject to suspension or revocation proceedings as prescribed by § 401.250.

A7

…

## § 401.700 Operating requirements for U.S. registered pilots

Each U.S. registered pilot shall—

(a) Provide pilotage service when dispatched by his pool; and

(b) Comply with the dispatching orders of the Director under § 401.720 (b).

## § 401.710 Operating requirements for holders of Certificates of Authorization

Each holder of a Certificate of Authorization shall—

(a) Comply with the terms of any agreement for services by registered pilots on the Great Lakes between an appropriate agency of Canada and the Secretary, his designated agent, or the Director;

(b) Coordinate on a reciprocal basis its pool operations with pool operations of the Canadian Government, under the "Memorandum of Arrangements, Great Lakes Pilotage, Between the Secretary of Transportation of the United States of America and the Minister of Transport of Canada", effective July 7, 1970, as amended;

(c) Provide continuous arrangements and facilities for the efficient dispatching of pilotage service on a first-come, first-serve basis to vessels that give notice of pilotage service requirements to the pilotage dispatch station, except pilots are not required to board a vessel that does not furnish safe boarding facilities;

(d) Dispatch pilotage service under the terms of its approved working rules as referenced in § 402.320;

(e) Comply with its working rules approved under § 402.320, except to the extent inconsistent with the dispatch orders of the Director under § 401.720(b);

(f) Comply with all accounting procedures and the reporting requirements in this chapter; and

(g) Make available to the Commandant all of its financial and operating records.

A8

**§ 401.720 Authority of the Director over operations**

(a) This section does not limit the authority of the Director under any other section in this chapter.

(b) When pilotage service is not provided by the association authorized under 46 U.S.C. 9304 because of a physical or economic inability to do so, or when the Certificate of Authorization is under suspension or revocation under § 401.335, the Director may order any U.S. registered pilot to provide pilotage service.