In The

# United States Court of Appeals

### For the District of Columbia Circuit

---

**MATTHEW J. HIGHT**,

*Plaintiff-Appellant,*

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY**, et al.,

*Defendants-Appellees,*

**ST. LAWRENCE SEAWAY PILOTS ASSOCIATION,**

*Defendant-Intervenor-Cross-Appellee.*

---

On Appeal from the United States District Court for the District of Columbia
(No. 1:21-cv-3277-RJL)

---

# REPLY BRIEF OF APPELLANT

---

Robert Johnson
**INSTITUTE FOR JUSTICE**
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

Jeffrey H. Redfern
Daniel Nelson
**INSTITUTE FOR JUSTICE**
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jredfern@ij.org
dnelson@ij.org

*Counsel for Plaintiff-Appellant Matthew J. Hight*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..............................................................................iii

SUMMARY OF ARGUMENT..........................................................................1

ARGUMENT...................................................................................................2

    I.    The Coast Guard's Final Decision is arbitrary and capricious.................2

        A. Neither the Final Decision nor the Coast Guard here adequately explains how Captain Hight's training was allegedly insufficient. .......3

        B. Neither the Final Decision nor the government's brief adequately explains how Captain Hight's temperament was allegedly disqualifying........................................................................................10

            1.  The tugboat incident. ................................................................12

            2.  The bridge incident. .................................................................16

            3.  The emails...............................................................................18

    II.   The Coast Guard has unconstitutionally delegated decisionmaking authority to the Association ...........................................................................21

    III.  Captain Hight has not waived his Non-Delegation or First Amendment arguments...........................................................................25

CONCLUSION...............................................................................................28

CERTIFICATE OF COMPLIANCE.................................................................29

CERTIFICATE OF SERVICE..........................................................................30

# TABLE OF AUTHORITIES

PAGE(S)

*CASES

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) ...................................................................... 27

*Am. Great Lakes Ports Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020); 2016 WL 7785765 ............................... 25

*Am. Wild Horse Preservation Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ............................................................ 8

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
721 F.3d 666 (D.C. Cir. 2013) ........................................................... 24

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
821 F.3d 19 (D.C. Cir. 2016) ............................................................ 24

*Baltimore Gas & Elec. Co. v. FERC*,
954 F.3d 279 (D.C. Cir. 2020) ............................................. 2, 3, 5, 8

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) ......................................................................... 2

*Carr v. Corning*,
182 F.2d 14 (D.C. Cir. 1950) ............................................................ 27

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ....................................................................... 8-9

---

*Authorities upon which we chiefly rely are marked with asterisks*

*El Rio Santa Cruz Neighborhood Health Ctr. v. DHS,*
    396 F.3d 1265 (D.C. Cir. 2005) ........................................................ 7-8

*Grand Canyon Air Tour Coal. v. FAA,*
    154 F.3d 455 (D.C. Cir. 1998) ........................................................ 2, 11

*Hight v. DHS,*
    No. 19-cv-02094 (APM), 2020 WL 12918345 (D.D.C. Mar. 30, 2020) .............5

*In re NTE Conn.,*
    26 F.4th 980 (D.C. Cir. 2022) ........................................................11, 18

*\*Janus v. AFSCME,*
    585 U.S. 878 (2018) ........................................................27

*Keller v. State Bar of California,*
    496 U.S. 1 (1990) ........................................................27

*Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans,*
    330 U.S. 552 (1947) ........................................................ 22

*Martin v. Occupational Safety and Health Review Comm'n,*
    499 U.S. 144 (1991) ........................................................ 9

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................ 2

*Safe Extensions, Inc. v. F.A.A.,*
    509 F.3d 593 (D.C. Cir. 2007) ........................................................ 2

**Statutes**

46 C.F.R. § 401.260(a) ........................................................ 16

**Other Authorities**

George J. Stigler,
   *The Theory of Economic Regulation*, 2 Bell J. Econ. & Mgmt. Science 3
   (Spring 1971)................................................................................................19

## SUMMARY OF ARGUMENT

The Coast Guard's Final Decision falls well short of the APA's standard of reasoned decisionmaking. It fails to rationally respond to arguments, or to respond at all. It baldly asserts things that are unsupported or contradicted by the record. And it reveals a complete lack of independent judgment—indeed, much of the decision is a paean to the Coast Guard's practice of deferring to private pilots' associations.

It is unsurprising, therefore, that the Coast Guard and the Association spend little effort trying to defend the Final Decision. Instead, they seek to supplement the decision with new arguments to support the license denial. These fresh assertions are unsupported by any record evidence—and uninformed by any meaningful investigation of the underlying facts—but they are also beside the point. The only question in this APA case is whether the Coast Guard acted lawfully in the decision under review. It did not, and, as a result, the decision below must be reversed or at a minimum vacated and sent back once again for the agency to *finally* exercise its regulatory function without improperly deferring to a private, for-profit Association that cannot constitutionally wield regulatory power.

# ARGUMENT

## I. The Coast Guard's Final Decision is arbitrary and capricious.

Under the APA, the Coast Guard is required to rationally respond to arguments presented to it, to explain and justify policy changes with retroactive effect, and to support its decision with sufficient record evidence. It did none of those things, and the Coast Guard's counsel on appeal is not allowed to remedy the deficiency. Even if it were, its efforts would fail. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983) ("[I]t is the agency's responsibility, not this Court's, to explain its decision."); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action...."); *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) ("If a party plausibly alleges that it has received inconsistent treatment … we must consider whether the agency has offered a reasonable and coherent explanation for the seemingly inconsistent results."); *Safe Extensions, Inc. v. F.A.A.*, 509 F.3d 593, 604 (D.C. Cir. 2007) ("[I]t is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense.") (citation omitted); *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998) ("An agency must

also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant.").

**A. Neither the Final Decision nor the Coast Guard here adequately explains how Captain Hight's training was allegedly insufficient.**

In the proceedings under review, Captain Hight argued that the Association imposed new and unwritten river training requirements on him retroactively, which had never been applied to previous pilots, for the specific purpose of denying his registration. **The Coast Guard did not offer any response to this argument below, and even now, it does not dispute that Captain Hight is correct.** That alone makes the Final Decision arbitrary and capricious. *See Baltimore Gas*, 954 F.3d at 286.

The Coast Guard claims that Captain Hight did not present sufficient evidence to support his allegations about the new training plan, but the decision below said no such thing—indeed it didn't address his arguments at all. In any event, the Coast Guard's new litigation position is incorrect.

Contrary to the Coast Guard's assertion that Captain Hight has not "identif[ied] any trainee who was granted full registration on all the waters of district one, including the St. Lawrence River, despite having completed only a half round trip on the river during the second stage of training, or any comparably small figure,"

CG Br. 55, Captain Hight identified ten such pilots. *See* JA-208 ("You are attempting to apply unprecedented standards to me. I suggest you exam[ine] pilot training records from pilot 164 to pilot 173 in order to gain some validity to the history of training by the [Association]."); JA-254 ("[T]he only pilots ever allowed to touch the controls [on the river] before registering were Telecki and Reese, due to a pilot shortage....Only after a pilot was fully registered was he allowed to pilot a ship on the river under an experienced pilot's supervision."). He also identified an eleventh pilot who did not complete his river training prior to taking the pilot's exam. JA-256-58 (explaining Chris Weigler's training). Chris Weigler was belatedly told to take more river trips—an opportunity not afforded Captain Hight—only after Captain Hight pointed out the inconsistent treatment.

The Coast Guard offers no explanation for Weigler being allowed to take the exam, despite having not completed what the Coast Guard claims was an essential training requirement. JA-182 ("We have never issued that exam to an [sic] mariner before he has successfully completed his training."). Nor can it explain why Weigler but not Hight was offered the opportunity to go back and take those river trips.[1] If

---

[1] The Coast Guard responds that the Final Decision under review concerns Captain Hight's application for registration, rather than the whether he should have been

these river trips were a well-known and established part of the training plan, as the Coast Guard asserts, why was it that both Captain Hight *and* Chris Weigler made it to the end of the Deputy Pilot phase of their training without completing that major requirement? (To say nothing of the ten other pilots Captain Hight identified.) The answer is simple: The river training requirement was a pretext invented to deny Captain Hight registration.

As far as the record reveals, the Coast Guard did not even look at the training records of the pilots that Captain Hight identified, and it strenuously opposed Captain Hight's efforts to obtain them.[2] No matter: Captain Hight's specific allegations are more than sufficient to impose on the Coast Guard the burden of looking at their own records to determine if his allegations are true. *Baltimore Gas*, 954 F.3d at 286. Under the government's approach, agencies could simply ignore most of what the public tells them, on the grounds that their assertions are verifiable

---

provided additional training. CG Br. 58. But so what? If the Final Decision is arbitrary and capricious because Captain Hight was not offered further training, then the Court can certainly remand to the agency on that basis. More fundamentally, *the fact* that further training wasn't offered to Captain Hight demonstrates that the "incomplete training" ground for denying him his registration was always a pretext.
[2] *See Hight v. DHS*, No. 19-cv-02094 (APM), 2020 WL 12918345, at *1 (D.D.C. Mar. 30, 2020) (denying request for discovery).

only by looking at governmental records that the agency won't let the public cannot access.

The APA requirement that the government investigate, address, and explain this inconsistency is particularly important in a case like this, where the government can point to no evidence whatsoever that undermines Captain Hight's allegations. **The Coast Guard acknowledges that there is no written record, anywhere, of the training requirement that Captain Hight supposedly failed to complete.** CG Br. 53-54; *Hight II* at 9 (Director Emerson in his Final "[D]ecision does not specify precisely how many trips a Deputy Pilot must make."); *ibid.* (opining that the river trips requirement might be "four," "five," or "whatever [] number.").[3] The first reference to "four river trips per season" is in an email from John Boyce to the Coast

---

[3] Unlike the Coast Guard, the Association now asserts, for the first time, that the "four round trips" requirement actually is written in the training plan. *See* Ass'n Br. 22 (citing JA-134). But the language that the Association points to describes the requirements of the *first* of the two training phases: the "Applicant Pilot" phase. JA-130; *see also* CG Br. 33 (noting the "distinction between the first phase … and the second phase"); *Compare* JA-132 (start of Phase 1), *and* JA-134 (Section 12 of Phase 1), *with* JA-135 (start of Phase 2). No one disputes Captain Hight completed Phase 1 training in 2016. CG Br. 16. When he did, "the Association … recommended he be advanced to the second stage." *Id.* "The Coast Guard agreed." *Id.* The requirements of the first stage are irrelevant to the Coast Guard's determination that Captain Hight "never … complete[d] the second stage." *Id.* at 33.

Guard in June 2018, but it is not in the approved training plan, and nothing in the record suggests that deputy pilots were completing their river training prior to receiving full registration before 2018. JA-214-15; *see also* CG Br. 32, 54 (relying on Boyce's 2018 email as the source of the "four round trips" requirement).

The failure to even look at pilot records is sufficient to render the decision arbitrary and capricious, but things get even worse for the Coast Guard, because the Association's own documents confirm Captain Hight's allegations. Under the Association's own articles, pilots could become fully registered before training on the river. JA-143. Section 2 details a "River Training Program" offered to both "Associate Members" (*i.e.*, Deputy Pilots who are "issued a Temporary Certificate of Registration," like Captain Hight, JA-139) *and* "Members" (*i.e.*, full pilots with permanent certificates of registration, JA-140-41).The Coast Guard responds that the Articles of Association did not explicitly *prohibit* deputy pilots from undergoing river training before registration. CG Br. 56. True enough. But the Coast Guard acknowledges that deputy pilots could only receive river training if it had first been offered to fully registered pilots who had yet to complete it. That concession disproves any suggestion that river training was a prerequisite for registration. *See El Rio Santa Cruz Neighborhood Health Ctr. v. DHS*, 396 F.3d 1265, 1278 (D.C. Cir.

2005) (agency action is "arbitrary and capricious" if the agency "failed adequately to address relevant evidence before it").

The Coast Guard's last move is to assert that even if Captain Hight has been treated inconsistently, it doesn't matter because the decisions of lower-level officials are not precedential. But Captain Hight is not claiming that the Coast Guard's decisions granting pilot registrations are binding precedents. He is pointing to those decisions as evidence of what the training plan actually was at the time he underwent training (since, as the Coast Guard concedes, the relevant aspects of the training plan were unwritten).

Under the APA, Director Emerson was required to explain why he was justified in retroactively applying a brand new training plan to a pilot who had undergone years of training in reliance on the old plan. *See Baltimore Gas*, 954 F.3d at 286 (rejecting contention that FERC did not need to explain inconsistent treatment merely because previous decisions were uncontested and issued by staff); *Am. Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) ("A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it."); *see also*

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156-57 (2012) (noting importance of reliance interests in assessing reasonableness of agency action); *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 158 (1991) (same).

Rather than acknowledge or justify this change in policy, the Final Decision accuses Captain Hight of knowingly neglecting his river training in order to maximize his income working on the lake. But the limited written documentation of the Association's training plan confirms Captain Hight's detailed allegation that river training was generally not even available to deputy pilots, which means that this accusation is simply false. The Final Decision's misunderstanding of the Association's training plan cannot constitute reasoned decisionmaking.[4]

---

[4] Incidentally, this meritless accusation also underscores the non-delegation problem; the Coast Guard has no idea how pilot training actually happens. Deputy pilots are dispatched by the Association; they do not get to decide where they go, and their income does not depend on whether they are on the Lake or the river. The Coast Guard simply parrots what the Association tells it and refuses to conduct even the most rudimentary investigation that would expose the inconsistency in treatment. JA-269 (Captain Hight "did not complete … training" simply because "Director Haviland and the [Association] have always maintained that."). Worse, the Final Decision does not even acknowledge Captain Hight's allegations.

This case would be a different if Director Emerson had issued a decision saying: "Prior to Captain Hight, no applicants were required to be fully qualified on the river as a condition of receiving registration, and they could complete that training afterwards, but I've decided now that it's essential that they do that training first, so even though Captain Hight did everything that was asked of him in reliance on the existing training plan, he cannot be registered." Such a decision would of course require remarkable justification to be upheld—because of the reliance interests in play and lack of evidence that the prior plan had proven inadequate—but would at least confront the issue honestly.

## B. Neither the Final Decision nor the government's brief adequately explains how Captain Hight's temperament was allegedly disqualifying.

As to Captain Hight's allegedly poor temperament, the entirety of the Final Decision is a single sentence:

> Based upon the several incidents cited in Director Haviland's denial of Captain Hight's request for full registration, particularly the heated argument on the bridge, and upon the increasingly antagonistic and aggressive tone of his numerous emails to my staff and to Admiral Nadeau over the last several years, I agree that Captain Hight does not possess the calm demeanor and professional temperament necessary to safely pilot foreign vessels throughout the waters of D1.

JA-274.

That's it. Captain Hight offered detailed explanations of these incidents in his administrative appeal, and the Final Decision offers no response whatsoever. *See Grand Canyon Air*, 154 F.3d at 468 ("An agency must also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant."). The Final Decision dedicates zero space to assessing the two disputed accounts from the bridge incident, and it cites or quotes not one purportedly "antagonistic and aggressive" email. It does not even mention the tugboat incident, which the Coast Guard's counsel now relies on in this proceeding.

The undisputed facts regarding these "incidents" in no way warrant license denial, which appears to be why the Coast Guard's counsel vacillates here on appeal. While the government initially asserts that the Final Decision "does not rest on any factual disputes about what occurred in any given incident," CG Br. 29, its brief repeatedly rejects Captain Hight's accounts, including in situations where the Coast Guard has not disputed Captain Hight's accounts. The Final Decision would have to offer a legitimate reason for crediting one account of an incident over another, had it done so. *See In re NTE Conn.*, 26 F.4th 980, 988 (D.C. Cir. 2022) ("The order

gives no explanation of *why* FERC found ISO-NE's evidence persuasive."). Instead, the Final Decision does not meaningfully grapple with the relevant facts.

### 1. The tugboat incident

The Final Decision never mentions the tugboat incident as a basis for denying Captain Hight a license, and at no point in the last 6 years has the Coast Guard ever asserted that Captain Hight was at fault for the incident or even aware of it when it occurred. Even the Association president, John Boyce, did not assert that Captain Hight was at fault. JA-74-75. The Coast Guard's position was that he should have reported the incident when he learned about it some days later from a third party, and that this failure to report indicates bad judgment.

Perhaps aware of how absurd this sounds, the Coast Guard's counsel has changed its tune before this Court. It implies (without quite asserting) that Captain Hight was responsible for the accident, and it asserts that he did, in fact, know about the accident at the time and chose not to report it. CG Br. 49. This argument comes far too late. "[I]t is the agency's responsibility, not this Court's, to explain its decision." *State Farm*, 463 U.S. at 57. The Final Decision does not mention the tug, and at no point prior to the filing of the government's brief has the Coast Guard ever disputed Captain Hight's consistent assertion that he did not know that an accident

had happened at the time. In any event, the record does not support this new assertion.

How does the Coast Guard's counsel now conclude, for the first time, that Captain Hight knew about the accident when it happened? By misreading Captain Hight's own words, written nine months after the incident:

> At some point during this evolution, I believe Bruce, the driver on the [tugboat], might have lost sight of or was not paying attention to the red channel buoy allowing his stern to come very close to the buoy and it's mooring. At the approximate time the vessel cleared the channel I heard Bruce on the radio indicating he was having trouble and later in the course of the VHF conversation learned he was experiencing propeller vibration.

> The FEARLESS cleared the port never contacting a channel marker, grounding or experiencing any reportable incident. I did not contemplate making any notifications, as the FEARLESS was not in any way damaged or compromised. Although I did not consider this a reportable incident since the piloted vessel was not involved, in retrospect, I should have taken the initiative to report the incident to our group. This would have allowed all to be informed and thus prepared if anyone outside the group inquired if we were involved.

JA-99-100. At no point in this account does Captain Hight state that he knew, at the time, that the tug hit a buoy. He is clearly conveying his present understanding of the incident, which, even with the benefit of hindsight, is still guesswork ("I believe Bruce…might have lost sight"). Nothing else in the record besides Captain Hight's

own, undisputed account, sheds any light on the incident.[5] And if there were any

ambiguity in Captain Hight's account regarding when he learned about the collision,

he certainly dispelled such ambiguity later through his repeated and emphatic

assertions that he did not know *at the time* of the incident that the tug had hit a buoy:

> While standing along the port side of the FEARLESS, in relative close proximity to the red channel markers, the OMNI RICHELIEU allegedly came in contact with the channel marker mooring. I was never informed by the tug operator there was a problem. I was never contacted by Ocean Group making me aware there was in fact damage. I was aware the tug was experiencing unusual vibration as I cleared the channel, bound for Port Weller, only because I heard the two tugs discussing it via VHF radio. The Ocean Group tugs frequently have mechanical difficulties and I did not think it was related to anything surrounding my use of the tugs.

JA-160 (email from Captain Hight to Coast Guard); JA-162 ("If the damage…in fact

occurred during the undocking…it was not ever reported to me."); *accord* JA-246

("I did not learn that it had been damaged until days later.") (sworn declaration).

The Coast Guard's counsel now seizes on whatever ambiguity it can find in *one* of

Captain Hight's statement to accuse him of perjury. But even if this new litigating

---

[5] The Coast Guard's brief asserts that "At the time of the collision, the tug—on plaintiff's direction—was pushing plaintiff's vessel to keep it on the correct side of the buoy." CG Br. 48. This is false. As Captain Hight repeatedly explained, the tug was not in contact with his vessel when they passed the buoy. JA-160. The government possesses no contrary evidence.

position were a proper basis for affirming, it would not stand up to scrutiny. The Coast Guard offers no reasoned basis for not accepting Captain Hight's explanations, and it possesses no other information about the incident.

Notably, although the Coast Guard stated that it was investigating the incident, the results of that investigation are not in the administrative record. JA-182 ("I directed Mr. Vince Berg to look into this situation."). Presumably, if the Coast Guard had found any information contradicting Captain Hight's account, it would have relied on it as a basis for its decision.

While it is true that Captain Hight later said he should have reported the incident, it is unclear what such a report would have looked like.[6] Had he reported it immediately, he would have been able to say little more than that he heard a tug on the radio say it was having propeller vibrations. If he had reported a few days later,

---

[6] The Coast Guard treats his statement that he should have reported the incident (in a letter in which he is begging to keep his job) as some kind of preclusive admission that not reporting was a valid basis to deny him his registration. CG Br. 39 (Plaintiff eventually admitted that he "should have picked up the phone immediately"). At other points, however, the Coast Guard says that Captain Hight's unwillingness to accept responsibility is a reason he is unfit to be a pilot. *Id.* at 29 ("Plaintiff's appellate brief still does not recognize why these red flags are troubling and continues to attempt to deflect responsibility onto anyone but himself."). They've got him coming and going.

when he learned that the tug was damaged, he would have only been able to offer speculation about what might have happened. (And since he learned that information second-hand, from other Association members, he had no reason to think that the Association needed to hear it from him; it was already common knowledge.)

The regulations require that an incident report "describe the accident, including type of accident, location, time, prevailing weather, damage to the vessel or vessels or property, and injury to persons or lives lost." 46 C.F.R. § 401.260(a). Even when Captain Hight later learned that the tug had hit a buoy, it was reasonable for him to think that the proper person to make such a report is the person in command of the damaged vessel, who actually knew what happened, rather than the person on a vessel nearby who only heard some chatter on the radio.

## 2. The bridge incident

The Coast Guard's reliance on the argument on the bridge of the *Federal Hunter* is equally flawed. Again, the Coast Guard insists the Final Decision's "conclusion does not rest on any factual disputes about what occurred in any given incident," but the Coast Guard's brief tells a story that is totally different from

Captain Hight's account. CG Br. 29. Here are the "undisputed" facts of the incident, in Association President Boyce's words no less:

> There was confusion regarding the vessel's berthing arrangements at Pier 10. Captain Hight and the [master] had discussions of berthing options in Hamilton … . The exchange became escalated when Captain Hight stated that he could not hear the crew's replies to his helm commands due to the [master's] phone calls and radio calls …. Capt. Hight and the Master had a Master/Pilot discussion on the bridge after the docking of the vessel. Capt. Hight has indicated that there were a few "F-bombs" exchanged with the Master during this exchange.

JA153.

There is no way these facts can be reasonably construed as career-ending. As President Boyce implied—and as Captain Hight's sworn testimony detailed—Captain Hight needed to hear his crew while attempting to dock a massive vessel. JA-246. But he couldn't hear his crew because the ship's master "was complaining loudly over his radio." JA-246. Under these dangerous circumstances, Captain Hight had to act fast amidst the "confusion." JA-153 (President Boyce's words). So he "raised [his] voice to command quiet." JA-246. Appellees cannot seriously contend Captain Hight exhibited poor temperament by demanding quiet so that he could be heard over the master's own loud remarks during a "confus[ing]" and imminently hazardous docking situation. That leaves Appellees with the untenable

contention that Captain Hight's pilot registration was rightfully denied because he said "a few 'F-bombs,'" not even directed "at" the master, while requesting silence on the bridge.

The Coast Guard's brief, notwithstanding its assertion that it was not relying on disputed facts, relies entirely on the Master's disputed account. CG Br. 39-40. But as Captain Hight explained in his opening brief, the master's story was "stale double-hearsay, solicited by the Association, months after the incident, and only *after* Captain Hight raised questions about the Association's finances and management." Hight Br. 43. The Master gave no account of what Captain Hight actually said. *See* JA-172-73 ("High [sic] badly shouted at me" and "threatened me in abusive language."). And he gave his account via forwarded email, filtered through the Association, with zero follow-up from the Coast Guard. This evidence is not the kind that could rationally justify denying a man a license to practice his trade. And if the Final Decision had purported to resolve disputed facts, it would at the very least have had to explain what it was doing and why. *See In re NTE Conn.*, 26 F.4th 980, 988 (D.C. Cir. 2022).

### 3. The emails

Lastly, the purported, but unspecified, "antagonistic and aggressive" emails

to the Coast Guard. As Captain Hight explained in his opening brief, he understandably was frustrated after repeated appeals to the agency tasked with overseeing the Association went nowhere. When Captain Hight complained of Association practices, the Coast Guard responded that is "between you and your [Association]," and Association practices are "not something we dictate," and "I am not sure how else I can help you." JA-87-89. And that was when the Coast Guard responded at all; repeatedly, it ignored Captain Hight's emails (resulting in a superior admonishing final decisionmaker Director Emerson). JA-228-29.

Captain Hight's emails, which are in the record, were tame compared to the abuse he has been subjected to by the Coast Guard and the Association in this case. His most pointed email alleged that the President of the Association "has Director Haviland in his pocket." JA-228. Essentially, he was complaining about regulatory capture, a well-known phenomenon that fits the record in this case. *See* George J. Stigler, *The Theory of Economic Regulation*, 2 Bell J. Econ. & Mgmt. Science 3, at 3 (Spring 1971) ("regulation is acquired by the industry and is designed and operated primarily for its benefit"). The Coast Guard complains of these accusations, CG Br. 42, as though regulated parties must behave like supplicants towards the bureaucrats who rule them. Regardless of whether Captain Hight's opinion about Boyce and

Haviland was correct, he was certainly entitled to express it, and he should not have been subject to retaliation simply because he did not grovel before the people who were taking his livelihood from him. Moreover, the connection between Captain Hight's emails and his temperament *while working as a pilot* is tenuous at best.

Beyond the emails, the Coast Guard cites some "additional evidence" of bad temperament, ***none of which is referenced in the Final Decision***. The government complains about Captain Hight's supposedly misleading testimony as an expert witness (in a case adverse to the government), but it does not appear to dispute that his testimony was objectively true. CG. Br. 43-44. As explained in Captain Hight's opening brief and administrative appeal, none of his testimony was even "misleading." *See* Hight Br. 44-46; JA-111-119 (discussing this testimony in more detail). The same goes for the Coast Guard's reference to allegedly poor feedback from his peers, which is sourced from an unsworn, unsourced, uncorroborated, and untrue accusation contained in a letter from the Association's counsel in the present case, sent long after this dispute began. JA-216-25. In contrast to the K&L Gates Letter, record evidence demonstrates Captain Hight always "ha[d] performed his work in accordance with accepted standards." JA-130 (Association's words). He had "received perfect [evaluation] marks." JA-243 (sworn undisputed testimony). He

had "never received any negative feedback about [his] work as a pilot." JA-243 (same). And, according to Association members, Captain Hight demonstrated an "excellent job communicating with the crew and Captain," "excellent situational awareness" while piloting, and an ability to solve problems "in an expedient and clear manner." Admin. Record Excerpts, *Hight I*, ECF 54-1 at 25. Only after Captain Hight angered the Association and President Boyce by voicing concerns over its business practices did the Association begin to smear Captain Hight. The K&L Gates letter is simply not credible in light of other record evidence (which is probably why the Final Decision does not rely on it).

## II. The Coast Guard has unconstitutionally delegated decisionmaking authority to the Association.

In his opening brief, Captain Hight explained how the Coast Guard has surrendered its regulatory authority over pilot registration to the Association, in violation of the non-delegation doctrine, by treating the Association's recommendation as dispositive, and uncritically accepting whatever the Association tells it, in spite of contrary evidence. Hight Br. 48-53. In response, the Coast Guard seems to agree with the basic legal framework: It is unconstitutional, both under Due Process and non-delegation principles, to give private parties authority to regulate

other private parties.[7] The Coast Guard simply argues that such delegation is not, in fact, occurring. The Coast Guard is wrong.

As evidence that the Coast Guard did not simply defer to the Association, the government's brief points to places in the record where the Coast Guard *stated* that it was conducting an investigation. CG Br. 61. For instance, the Coast Guard stated that it was in "the process of gathering facts and evaluating [the] veracity" of allegations regarding the tug incident. JA-182. But where are the results of that investigation? Not in the record. And while the Coast Guard said it was reviewing Captain Hight's training records to see if he had completed his requirements, JA-190, the record shows that the Coast Guard forwarded those records to the Association, which then told the Coast Guard to adopt a new interpretation of the regulations, specifically in order to make Captain Hight's training trips non-qualifying, and the Coast Guard obliged. JA-190; JA-194-95. The Association's president said as much. JA-75. Similarly, the Coast Guard acknowledges that the

---

[7] The Association, by contrast, seems argue that under *Kotch v. Bd. of River Port Pilot Comm'rs for Port of New Orleans*, 330 U.S. 552 (1947), non-delegation principles simply don't apply to pilotage. Ass'n. Br. 30. But *Kotch* was a case about a state's authority to appoint pilots who were themselves state officers. *Id.* at 557 ("[T]his case tests the right and power of a state to select its own agents and officers."). The Coast Guard's counsel sensibly does not adopt this argument.

training requirement Captain Hight supposedly did not complete is unwritten, but it does not even contemplate the possibility that the requirement is new and retroactive. JA-269–272.

This is all damning, but the context makes it worse. Prior to this litigation, the Coast Guard was quite open about the fact that it believed that the Association had the final say on who gets to be a pilot. See JA-187-88 ("between you and your [Association]"). Director Emerson, who wrote the Final Decision, likewise said that "[t]he Coast Guard does not have any authority to interfere with pilot employment decisions … ." JA-227. Of course, in the Final Decision, he belatedly claims to be exercising his own discretion, but he spends more words defending the practice of deference to the Association than he does examining the facts of Captain Hight's case. JA-269-75.[8] Under these circumstances, this Court should look with a jaundiced eye at the Coast Guard's claims of independent judgment.

The Coast Guard attempts to distract from this record by pointing out that (1) in other contexts, the Coast Guard does not decide *every* issue exactly the way the

---

[8] The Coast Guard appears to have abandoned the argument that the lack of a positive recommendation from the Association is, by itself, a valid ground to deny Captain Hight his registration.

Association wants, and (2) the Coast Guard in theory possesses all kinds of regulatory authority over the Association, which it could exercise if it wanted. CG Br. 60, 64. But so what? The Coast Guard cites no authority for the proposition that, so long as the agency possesses authority that it does not use, or uses its authority over some issues, it is allowed to delegate authority over other issues. The non-delegation doctrine prohibits the government from delegating *any* authority to regulate unwilling third parties, much less the major authority to decide whether an American can receive a license to practice his trade.

In *American Railroads*, for instance, the D.C. Circuit held that a federal statute violated the non-delegation doctrine because it gave Amtrak a role regulating freight operators that shared rails with Amtrak's passenger trains. *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 670-71 (D.C. Cir. 2013), vacated on other grounds, 575 U.S. 43 (2015). If the government's theory were correct, then *American Railroads* was wrongly decided because other federal agencies retained significant authority over freight rail operations. *See also Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 34 (D.C. Cir. 2016) (reaching same result on due process grounds). Likewise in *Carter Coal*, the Court struck down the private delegation of authority to regulate wages and hours in coal production even though other

regulatory authority over coal production had been retained by the government. *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). By the same token, what matters in this case is that the Coast Guard has delegated the authority to decide who gets to be a pilot on the Great Lakes to private parties, not that it retains authority over other issues.[9]

### III. Captain Hight has not waived his Non-Delegation or First Amendment arguments.

The Coast Guard acknowledges that Captain Hight has consistently argued, from *Hight I* onward, that the First Amendment does not allow the government to make membership in the Association a condition of becoming a pilot on the Great Lakes. CG Br. 66-67; JA-62 (complaint alleging that "The Coast Guard's requirement that Captain Hight join the Association to work as a Registered Pilot in

---

[9] The Association argues that non-delegation should not apply because the Association has no economic incentive to reduce competition, in that its rates are federally regulated. But the Association's own counsel has previously argued in federal court that the rates should be increased in order to attract more pilots, and the Coast Guard agreed. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 511 (D.C. Cir. 2020); 2016 WL 7785765 (Ass'n. brief) ("Great Lakes pilots are compensated at lower levels than pilots in other jurisdictions, and [] this is harming the pilotage system in general and the ability to attract and retain Great Lakes pilots in particular.").

District One violates the First Amendment."). Now, however, the Coast Guard asserts that Captain Hight has abandoned that argument and attempted to substitute a new one—that the training requirement, rather than the membership requirement, violates the First Amendment. The Coast Guard is mistaken. Captain Hight's argument is the same as it has always been.

Captain Hight acknowledges that the requirement that he train with registered pilots is unobjectionable *by itself*. The First Amendment problem arises when that training requirement is combined with: (1) the Association's unreviewable discretion to decide who to train, who to admit as a member, and who to dispatch to work on the Great Lakes and (2) the Coast Guard's requirement that one be a member of the Association to become registered. Under these circumstances, the training requirement is effectively a private veto on individuals receiving a government license (violating the non-delegation doctrine, as explained above) *and* a requirement that one join a private organization to work (violating the First Amendment). In other words, the training requirement is a means of enforcing the membership requirement, which is the real First Amendment issue. JA-62 (the training requirement "functionally amounts to a requirement to join the Association because the Association does not train or recommend pilots who do not join.").

With regard to the First Amendment, the Coast Guard does not appear to dispute that, under *Janus v. AFSCME*, 585 U.S. 878 (2018), it would be unconstitutional to force Captain Hight to join the Association as a condition of working on the Great Lakes. CG Br. 68.[10] As he pointed out in his opening brief, the Association unquestionably speaks on matters of public concern. The Coast Guard's position seems to be that the issue isn't ripe because Captain Hight couldn't become a member anyway until he has finished training. The flaw in this argument is that when the Association gets to decide who it trains, the training requirement and the membership requirement become one and the same. Training is just the prerequisite for membership. To hold otherwise would mean that the union in *Janus* could evade the First Amendment by imposing a requirement that all workers obtain training from the union, which the union could withhold from anyone at its discretion. That would be a *de facto* membership requirement that would render *Janus* a dead letter.

---

[10] The Association denies that *Janus* governs. It argues that this case is instead controlled by *Keller v. State Bar of California*, 496 U.S. 1 (1990), which upheld mandatory bar dues as a condition of legal employment. But *Keller* applied *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), and *Abood* has now been explicitly overruled. Any opinion purporting to apply *Abood* is bad law, just as opinions applying *Plessy v. Ferguson* are bad law even if they have not been overruled by name. *E.g., Carr v. Corning*, 182 F.2d 14, 21 (D.C. Cir. 1950).

## CONCLUSION

The Court should vacate the Coast Guard's decision and order it to grant Captain Hight's application for registration or, in the alternative, remand for further proceedings.

Dated: June 3, 2024

Respectfully submitted,

/s/ Jeffrey H. Redfern

Robert Johnson
**INSTITUTE FOR JUSTICE**
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

Jeffrey H. Redfern
Daniel Nelson
**INSTITUTE FOR JUSTICE**
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
jredfern@ij.org
dnelson@ij.org

*Counsel for Plaintiff-Appellant Matthew J. Hight*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,336 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 with a 14-point Equity A font.

Dated: June 3, 2024                        /s/ Jeffrey H. Redfern

                                                Jeffrey H. Redfern

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2024, I filed the foregoing Reply Brief of Appellant with the Clerk of the United States Court of Appeals for the D.C. Circuit via the CM/ECF system, which will notify all participants in the case who are registered CM/ECF users.

Dated: June 3, 2024

/s/ Jeffrey H. Redfern
Jeffrey H. Redfern