# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 29, 2024          Decided May 2, 2025

No. 23-5273

MATTHEW J. HIGHT,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET
AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-03277)

———

*Jeffrey H. Redfern* argued the cause for appellant. With him on the briefs were *Robert Johnson* and *Daniel Nelson*.

*Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Lindsay S. See*, Solicitor General at the time the brief was filed, *Michael R. Williams*, Principal Deputy Solicitor General at the time the brief was filed, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *Raúl Labrador*, Attorney General, Office of the Attorney General for the State of Idaho, *Brenna Bird*, Attorney General, Office of the

2

Attorney General for the State of Iowa, *Kris Kobach*, Attorney General, Office of the Attorney General for the State of Kansas, *Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Andrew Bailey*, Attorney General, Office of the Attorney General for the State of Missouri, *Austin Knudsen*, Attorney General, Office of the Attorney General for the State of Montana, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, and *Sean D. Reyes*, Attorney General, Office of the Attorney General for the State of Utah, were on the brief for *amici curiae* States of West Virginia, *et al*. in support of appellant.

*Joshua Dos Santos*, Attorney, U.S. Department of Justice, argued the cause for government appellees. On the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General at the time the brief was filed, *Matthew M. Graves*, U.S. Attorney at the time the brief was filed, *Mark B. Stern*, Attorney at the time the brief was filed, and *Joseph F. Busa*, Attorney. *Douglas C. Dreier*, Attorney, entered an appearance.

*John Longstreth* argued the cause for intervenor-appellees. With him on the brief were *Mark H. Ruge* and *Tre A. Holloway*.

Before: MILLETT, WILKINS and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: From 2015 to 2018, Captain Matthew Hight trained with the Saint Lawrence Seaway Pilots Association ("Pilots Association") to become a maritime pilot on Lake Ontario and the St. Lawrence River. The Great Lakes Pilotage Act of 1960 ("Pilotage Act") requires that certain ships on the Great Lakes and St. Lawrence River, which connects the lakes to the Atlantic Ocean, have a Coast Guard or Canadian registered pilot on board to assist with navigation.

3

The Pilotage Act vests authority in the Coast Guard to register American pilots, establish the conditions of their service, and set the rates they must charge. The Coast Guard is also tasked with supervising private pilotage associations that are responsible, by statute, for the "rendering of pilotage services." 46 U.S.C. § 9304(a). Pilotage associations are also charged, by regulation, with training new pilots. 46 C.F.R. § 401.220(b)(2) (2021). The Pilots Association is the only entity approved by the Coast Guard to train and dispatch pilots on Lake Ontario and the St. Lawrence River.

In 2018, Hight applied to the Coast Guard for registration as a pilot. The Pilots Association recommended that the Coast Guard deny Hight's application. After conducting an independent review of Hight's training records, the Coast Guard denied Hight's application. It determined that Hight failed to complete the Pilots Association's prescribed training program and therefore did not have the navigational experience needed for registration. The Coast Guard also found that Hight was ineligible both because he did not have the temperament required of a maritime pilot and because he had received a negative recommendation from the Pilots Association.

Hight challenged that decision in federal court on several grounds. As relevant to this appeal, he argues that the Coast Guard (i) acted arbitrarily and capriciously in denying him registration as a pilot, in violation of the Administrative Procedure Act, (ii) unconstitutionally delegated regulatory authority to the Pilots Association, a private entity, and (iii) violated the First Amendment by requiring Hight to train with and join the Pilots Association. The district court rejected each of these claims. We affirm.

4

# I

## A

"As a profession, pilotage owes its existence to the infinite variety of navigation hazards—currents, tides, sand bars, submerged objects, weather conditions, and the like—that mark the harbors and rivers open to commercial vessels" in the United States. *Jackson v. Marine Expl. Co.*, 583 F.2d 1336, 1338–1339 (5th Cir. 1978). Because each waterway presents unique hazards, "it has long been the practice of vessels" to hire local pilots to guide ships across these waters and between ports and the open sea. *Id.* at 1339.

Private pilotage associations are at the center of this profession, and have been for centuries. As early as the fourteenth century, pilot guilds and associations formed at major English ports. GROSVENOR M. JONES, PILOTAGE IN THE UNITED STATES 7 (1917). These associations were established by royal charter, and their "principal objects" were "to provide * * * a body of qualified and duly licensed pilots; to prevent unqualified persons from undertaking to pilot vessels at all; and, lastly, to provide for the regulation and good government of the bodies of licensed pilots." *Id.* at 7–8 (citation omitted).

This tradition carried over to the United States. "When the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every State." *Gibbons v. Ogden*, 22 U.S. 1, 207 (1824). Though the federal government maintained "concurrent" jurisdiction over pilotage, the first Congress "adopt[ed]" the system of state-regulation of pilots and "g[a]ve it the same validity as if [the state] provisions had been specially made by Congress." *Id.* In 1789, Congress enacted a statute providing that "all pilots in the * * * rivers, harbours and ports of the United States, shall

5

continue to be regulated in conformity with the existing laws of the States * * * until further legislative provision shall be made by Congress." *Id.* at 116–117 (quoting Act of Aug. 7, 1789, 1 Stat. 53, 54) (codified as amended at 46 U.S.C. § 8501(a)).

Today, States are still responsible for regulating most pilots. But Congress has preempted state regulation in certain areas, including the Great Lakes and St. Lawrence River. "Construction of the Saint Lawrence Seaway was completed in 1959" and opened an accessible route for large commercial ships from the Great Lakes to the Atlantic Ocean. *Halverson v. Slater*, 129 F.3d 180, 182 (D.C. Cir. 1997). The seaway is made up of a system of locks and channels that allows vessels to navigate safely across the St. Lawrence River. Mike Piskur, *Management of the Great Lakes-St. Lawrence Maritime Transportation System*, 42 CAN.-U.S. L.J. 227, 228 (2018).

The year following the St. Lawrence Seaway's construction, Congress passed the Great Lakes Pilotage Act of 1960, 46 U.S.C. §§ 9301–9308. To address safety concerns from already increased traffic and to coordinate regulation with the Canadian government, the Pilotage Act requires that certain commercial ships hire an American or Canadian pilot to assist in navigation. *American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 512–513 (D.C. Cir. 2020). "[T]o provide for efficient dispatching of vessels and rendering of pilotage services[,]" the Act also empowers the Coast Guard to "authorize the formation of * * * pool[s] by * * * voluntary association[s] of United States registered pilots"—that is, private pilotage associations. 46 U.S.C. § 9304.

Pursuant to its statutory authority, the Coast Guard certified three pilotage associations to be the exclusive American providers of Great Lakes pilotage services in specific

6

regions—or "Districts"—of the Great Lakes and St. Lawrence River.  *See* 46 C.F.R. § 402.320 (2021).  The St. Lawrence Seaway Pilotage Association provides pilotage services in District One, which encompasses all domestic waters of the St. Lawrence River and Lake Ontario.  *Id.* §§ 401.300(a)(1), 402.320(a)(1)–(2) (2021)*.*  Under the Pilotage Act, the President is also authorized to "designate[]" certain parts of the Great Lakes for special pilotage requirements based on "the public interest, the effective use of navigable waters, marine safety, and the foreign relations of the United States."  46 U.S.C. § 9302(a)(2).  In such designated waters, the pilot "direct[s] the navigation of the vessel subject to the customary authority of the master" of the vessel, while in non-designated waters, the pilot need only "be on board and available."  *Id.* § 9302(a)(1)(A), (B).

The President designated the waters of the St. Lawrence River for special pilotage requirements, but not Lake Ontario. Proclamation No. 3385, 25 Fed. Reg. 13679, 13681 (Dec. 24, 1960); *see also* 81 Fed. Reg. 11908, 11910 (Mar. 7, 2016). The River is particularly difficult to navigate.  It takes approximately 10.8 hours to traverse and "is marked by numerous small islands and rocky outcrops, extremely narrow channels with vessel control regulations, swift currents, ice flows[,] and three sets of Seaway locks, where vessels have become trapped in early winter ice."  J.A. 271.  Because navigation on the River is "so demanding[,]" pilots must switch out halfway through the 10.8 hour journey.  J.A. 271.  By contrast, pilots can navigate for over twenty hours without relief in certain undesignated parts of the Great Lakes.  J.A. 271.

The Pilotage Act also charges the Coast Guard with "prescrib[ing] by regulation standards of competency to be met by each applicant [pilot] for registration[.]"  46 U.S.C.

7

§ 9303(a).  Under that authority, the Coast Guard issued regulations governing both the training and registration of pilots.  Under the regulations in effect when Hight was seeking registration, the Coast Guard mandated that pilot associations submit their training "course[s] of instruction" for approval and that those courses meet ten "minimum criteria[.]"  46 C.F.R. § 402.220(b) (2021).  The Coast Guard also had to approve each of the pilots designated to train applicants.  *See id.* § 401.211(c) (2021).

For applicants to become registered pilots on the Great Lakes and the St. Lawrence River, Coast Guard regulations created two types of registration.  First, the agency offered "temporary certificate[s] of registration" to pilots who had met a subset, but not all, of their training program's requirements. *See* 46 C.F.R § 401.220(e) (2021); J.A. 132–135.

Second, the Coast Guard offered five-year registrations to applicants who had met minimum qualifications and had completed three requirements specific to pilotage on the Great Lakes and the St. Lawrence River.  The qualifications included that the applicant be "of good moral character and temperate habits[,]" possess various licenses, and pass a physical and vision examination.  46 C.F.R. § 401.210 (2021).

In addition, region-specific criteria required the applicant to complete a "minimum number of trips * * * over the waters for which application is made[,]" "a course of instruction * * * prescribed by the association authorized to establish the pilotage pool," and "a written examination[.]"  46 C.F.R. § 401.220(b) (2021).  Once a qualified applicant satisfied all of those requirements, the pilot association would submit to the Coast Guard a "recommendation[] together with its reasons for the registration" of the applicant.  *Id.* § 401.220(c) (2021).  The Coast Guard would then determine whether the applicant was

8

"qualified" for a five-year, renewable registration that allowed the applicant to perform pilotage services in one of the three districts of the Great Lakes. *Id.* §§ 401.220(d), 401.230(a), 401.240 (2021).

**B**

**1**

At the time relevant to this case, the St. Lawrence Seaway Pilotage Association had a two-phase training plan. During the first phase—the "Applicant Pilot Training Phase"—applicant pilots made "all trips in the company of registered pilots." J.A. 132. At the end of each trip, the registered pilot evaluated the applicant's performance and assigned a numerical grade for specific components, such as "Great Lakes pilotage knowledge" and "[a]bility to communicate[.]" J.A. 133. The training plan also prescribed a minimum number of trips applicants needed to complete out of specified ports in District One. J.A. 133–134.

At the end of the first phase, the Pilots Association would recommend applicant pilots to the Coast Guard to receive one-year temporary registrations that allowed them to solo pilot vessels on the undesignated waters of Lake Ontario, but not on the designated waters of the St. Lawrence River. Pilots who received that temporary registration were designated deputy pilots.

During the second phase—the "Deputy Pilot Training Phase"—deputy pilots used their temporary registration to work alone on Lake Ontario. J.A. 135. Under the plan, members of the Pilots Association's training committee would "spot-check" the deputy pilots' performance on the Lake "at least three times per season[.]" J.A. 135. The training plan

9

separately required the deputy pilots to "continue to make trips in the designated water of the pilotage district"—that is, the St. Lawrence River—"in the company of Registered Pilots." J.A. 135.

Pilots who successfully completed the deputy pilot training program could then seek full registration from the Coast Guard. 46 C.F.R. § 401.220(b), (d) (2021). Once granted registration, those pilots could become a member of the Pilots Association by purchasing one share of stock in the Pilots Association's affiliated corporation. The price of each share was set at "the value of the corporation's assets divided by the number of members in the Association." J.A. 18. In 2018, when Hight says he should have been allowed to join, the cost of a single share was close to $200,000. J.A. 18.

**2**

Hight began his apprenticeship with the Pilots Association in 2015. Before that, he had served as a professional mariner on other waterways for twenty years and spent eight years as a ship master.

By all accounts, Hight performed well during the applicant phase and, in 2016, the Pilots Association recommended to the Coast Guard that Hight receive his temporary registration. The Coast Guard found Hight to be qualified and issued him a one-year temporary registration for the 2016 shipping season, which it renewed in subsequent years.

At this point, the parties' stories differ. According to Hight, he completed the deputy pilot training of the Pilots Association's Training Plan in 2017 and, in early 2018, the Pilots Association told him it would make him a registered pilot that year. Hight says that, around this time, he approached John

10

Boyce, the president of the Pilots Association, with concerns about the Pilots Association's financial decisions and some of Boyce's practices as president. He questioned, in particular, the Pilots Association's purchase of expensive property and Boyce's close relationship with Todd Haviland, the Coast Guard's Director of Great Lakes Pilotage.

The Coast Guard, by contrast, focuses on two incidents that occurred during Hight's deputy pilot training. First, in the summer of 2017, while Hight was piloting a vessel solo on Lake Ontario, a tugboat that was assisting with the undocking of his vessel struck a buoy and was damaged. Hight later insisted that the "tugboat was damaged after it was untethered from [his] vessel (implying tugboat driver error)[,]" and said he did not learn of the damage "until days" after the incident. J.A. 245–246. Hight, however, never reported the incident to the Pilots Association or to the Coast Guard. J.A. 100, 153. When the accident came to light several months later, Hight acknowledged that he should have reported it. J.A. 100.

Second, in December 2017, while piloting the Federal Hudson, a Canadian-managed merchant ship, Hight had a heated argument with its ship master. J.A. 85–86. As the master was speaking over the radio, Hight shouted at him to be quiet. After mooring the vessel, Hight confronted the master on the bridge of the ship, accused him of a "lack of situational awareness[,]" and used "expletives[.]" J.A. 101.

Apart from these incidents, the Coast Guard claims that, once Hight obtained his temporary registration, he "focused on maximizing time on Lake Ontario" and completed approximately 100 solo trips during each of the 2016 and 2017 seasons. J.A. 270. These trips allowed him to "earn 'a full pilot's salary'" while, according to the Coast Guard, "neglect[ing] his responsibility to continue his supervised

11

training on the Saint Lawrence River[.]"   J.A. 270 (citation omitted).

Based on these incidents, the Pilots Association recommended to Director Haviland in March 2018 that Hight not "continue as a Temporarily Registered Pilot and Applicant Pilot in Training on all District 1 waters for the 2018 season." J.A. 153–154.  Later that same day, the Director "concur[red] with [the Pilots Association's] recommendation."   J.A. 155. Soon after, the Pilots Association removed Hight from its "tour de role"—the list of pilots available for dispatches.  That action prevented Hight from piloting any ships in District One (that is, on Lake Ontario or the St. Lawrence River).  J.A. 250.

The next month, the Coast Guard adjusted its decision and issued Hight a temporary registration for the 2018 navigation season.  At the same time, Director Haviland informed Hight that he was "still an Apprentice Pilot" for the Pilots Association.  J.A. 182.

Hight then requested that the Coast Guard administer the written exam required for full registration as a pilot and that, if he passed, he be granted a "full five year registration certificate[.]"   J.A. 158.   The Coast Guard refused on the grounds that Hight had not received a positive recommendation from the Pilots Association or completed the minimum number of trips on the designated waters of the St. Lawrence River within the time period required by regulation.  *See* 46 C.F.R. §§ 401.220(b)(1), 402.220(a)(1) (2018).

Hight responded by filing suit in the United States District Court for the District of Columbia.  The court ruled that the Coast Guard had misread the timeframe in which Hight had to accomplish his minimum trips.  *Hight v. United States Dep't of Homeland Sec.* ("*Hight I*"), 533 F. Supp. 3d 21, 27–30 (D.D.C.

12

2021).  The court then ordered the Coast Guard to administer the written exam to Hight.  *Id.* at 30–31.  In so ruling, the district court did not decide whether Hight, if he passed the exam, would otherwise be eligible for full registration, and the court was explicit that it did not "take a position on whether a positive recommendation from the relevant association is required before an Applicant Pilot can be fully registered by the Coast Guard." *Id.* at 30.

Hight passed the written exam.  J.A. 82.  In July 2021, he requested that the Coast Guard provide him his "full five-year registration" and ensure that he be "immediately placed on the tour de role for work in District 1[.]"  J.A. 83.  The Pilots Association again recommended to the Coast Guard that Hight be denied registration.

## C

In December 2021, Director Haviland denied Hight's request for full registration.  The Director cited four grounds for the denial:

- Hight "did not complete" the Pilots Association training requirements and had not "clearly demonstrated proficiency in piloting foreign vessels through the[] challenging waters" of the St. Lawrence River;

- Hight "demonstrated unprofessional conduct and a troubling lack of candor[,]" including in his interaction with the Federal Hudson master and in his failure to report the tugboat incident;

- While providing expert-witness deposition testimony in an unrelated lawsuit, Hight

13

misrepresented his title and experience as a Great Lakes pilot and as a mariner; and

- The Pilots Association did not recommend Hight for registration.

J.A. 85–87. With respect to the last point, the Director added that "I would deny your request even with a positive endorsement" from the Pilots Association. J.A. 87.

Hight administratively appealed that decision, and Michael Emerson, the Coast Guard Director of Marine Transportation Systems, issued a final decision on behalf of the Coast Guard affirming Haviland's denial. The Systems Director relied on three of the grounds identified by Director Haviland.

*First*, in a section titled "Completion of the Association Training Plan[,]" the Systems Director found that Hight had not demonstrated "proficiency and expertise" in piloting vessels in District One. J.A. 269–272. He noted in particular that Hight had "neglected his responsibility to continue his supervised training on the Saint Lawrence River[.]" J.A. 270.

*Second*, as "an additional basis" for his decision, the Systems Director found that Hight did "not possess the calm demeanor and professional temperament necessary to safely pilot foreign vessels" in District One. J.A. 274. Emerson cited the "several incidents" identified in Director Haviland's letter, emphasizing "the heated argument on the bridge[.]" J.A. 274. He also pointed to "the increasingly antagonistic and aggressive tone of [Hight's] numerous emails" to the System Director's staff. J.A. 274.

14

*Third*, Emerson found that Hight lacked a recommendation from the Pilots Association and that such a recommendation "is standard industry practice." J.A. 272. He concluded that the district court's decision in *Hight I* had not "foreclosed any further input" from the Pilots Association on Hight's fitness to hold a full registration. J.A. 273.

Hight filed suit challenging the Coast Guard's final decision. He alleged that the Coast Guard's decision was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), violated both the private non-delegation doctrine and the First Amendment to the Constitution, and was collaterally estopped by *Hight I*. The Pilots Association intervened as a defendant, and the parties cross-moved for summary judgment.

The district court granted summary judgment in full to the Coast Guard. *Hight v. United States Dep't of Homeland Sec.*, 694 F. Supp. 3d 127 (D.D.C. 2023). First, the court held that *Hight I* did not preclude the Coast Guard from resting its registration denial on Hight's incomplete training. *Id.* at 136–138. Second, the court held that Hight's First Amendment claim and one of his APA claims were not ripe because both challenged the requirement that Hight join the Pilots Association to pilot in District One even though he was not yet eligible to join the Pilots Association. *Id.* at 136. Third, the court found the agency's decision to deny Hight registration was not arbitrary and capricious for several reasons. *Id.* at 138–144. To start, the court pointed out that the agency rationally concluded that Hight failed to complete his Pilots Association-mandated training. The court noted, in particular, that the training plan required deputy pilots to make "supervised trips" (plural) on the St. Lawrence River, and Hight had completed just one supervised trip. *Id.* at 139. The Coast Guard also had "substantial evidence[,]" including the tugboat and Federal

15

Hudson incidents, to find that Hight was of unsuitable temperament.  *Id.* at 142–143.  Lastly, the court rejected Hight's argument that the Coast Guard had unconstitutionally substituted the Pilots Association's negative recommendation for its own judgment.  *Id.* at 141.  "The record shows," the district court held, that "the Coast Guard *did* exercise its own judgment in denying registration for Captain Hight[.]"  *Id.*

Hight appeals the district court's judgment on three grounds.  First, he claims the Coast Guard's final decision was arbitrary and capricious.  Second, he argues the Coast Guard unconstitutionally delegated authority over both training and registration decisions to a private body, the Pilots Association. Third, he claims the requirements that he train with and join the Pilots Association violate the First Amendment.  Several States filed an amicus brief in support of Hight that focused on his private non-delegation claim.

**II**

The district court had subject matter jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

We review *de novo* the district court's grant of summary judgment to the Coast Guard on Hight's arbitrary-and-capricious and constitutional claims.  *Silver State Land, LLC v. Schneider*, 843 F.3d 982, 989 (D.C. Cir. 2016); *National Oilseed Processors Ass'n v. Occupational Safety & Health Admin.*, 769 F.3d 1173, 1179 (D.C. Cir. 2014).

The APA requires that we "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended

16

it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]"  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In evaluating whether the agency has met this standard, the court must "not * * * substitute its [own] judgment for that of the agency."  *Id.*

**III**

Two of Hight's challenges are without merit, and we lack jurisdiction to reach the third.  The Coast Guard's final decision complied with the requirements of the APA because it was well-reasoned and supported by the record.  The Coast Guard's determination also fits comfortably within delegation principles because the Coast Guard relied on the Pilots Association only for advice and for assistance gathering facts. Hight's First Amendment challenge, to the extent he preserved it, is not ripe.

**A**

Hight's claim that the Coast Guard's final decision denying him registration was arbitrary and capricious fails because the Coast Guard reasonably concluded that Hight did not complete the deputy pilot training requirements and therefore did not qualify for registration under established Coast Guard regulations.

**1**

In his final decision, Emerson explained that Hight failed to complete the "required training program" for pilot registration—specifically, Hight had not completed the required supervised trips on the St. Lawrence River.  J.A. 269–

17

270.  That decision was both "reasonable and reasonably explained." *Cytori Therapeutics, Inc. v. Food & Drug Admin.*, 715 F.3d 922, 926 (D.C. Cir. 2013).

Pilot applicants must complete a pilotage association training plan to be eligible for registration.  Coast Guard regulations provide that "[r]egistration of pilots shall be made from among those Applicant Pilots who have[,]" among other requirements, "completed a course of instruction for Applicant Pilots prescribed by the association authorized to establish the pilotage pool[.]"  46 C.F.R. § 401.220(b), (b)(2) (2021).

The Pilots Association's training plan relevant for the Great Lakes and St. Lawrence River required deputy pilots, in addition to piloting trips on Lake Ontario, "[to] continue to make trips in the designated waters of the pilotage district"— that is, the St. Lawrence River—"in the company of Registered Pilots."  J.A. 135.  The training plan did not specify the exact number of trips a deputy pilot needed to undertake, but the plan was explicit that at least two "trips" (plural) were required.  J.A. 135.

Hight does not dispute that he completed only one qualifying trip on the St. Lawrence River after becoming a deputy pilot.  For a trip to satisfy the training requirement, a registered pilot had to accompany the deputy pilot and score the deputy's performance at one or more points.  J.A. 134–137.  In May 2016, as a deputy pilot, Hight completed a single evaluated trip on the St. Lawrence River.  J.A. 55, 153, 205, 207.

Given that undisputed record of insufficient experience on the designated waters of the St. Lawrence River, Emerson rationally found and reasonably explained that Hight failed to complete the "supervised training on the Saint Lawrence River,

18

which was necessary to complete the training plan." J.A. 270. That alone was a sufficient reason to deny Hight's registration as a full pilot.

**2**

Hight offers three responses, but none shows the Coast Guard's decision was arbitrary and capricious.

*First*, Hight claims the Pilots Association could not have mandated St. Lawrence River trips for completion of the training program because, at the time, "applicant and deputy pilots were not *allowed* to practice" on the river. Hight Opening Br. 33. That argument is incorrect.

To start, Hight never fairly presented that argument to the Coast Guard for it to consider. Hight raised this argument in a declaration he submitted in the district court in *Hight I*. J.A. 254. After the district court remanded the case to the Coast Guard, however, Hight did nothing more than attach that declaration to his letter appealing Haviland's registration denial. *See* J.A. 107. At the same time, in the body of that letter, Hight took the opposite position. He insisted that he had completed the "training prescribed" by the Pilots Association, including "round trips on the designated waters of District One[.]" J.A. 107.

Such contradictory positions will not suffice. When a party seems "to abandon its argument * * * by taking inconsistent positions, the agency d[oes] not have a fair opportunity to address th[at] argument." *Busse Broad. Corp. v. Federal Communications Comm'n*, 87 F.3d 1456, 1461 (D.C. Cir. 1996).

19

In addition, the evidence before the agency contradicted Hight's contention. Hight, himself, submitted training documentation that reflected he completed multiple river trips during the *applicant pilot phase*. J.A. 208–209. Yet the Pilots Association provided evidence that Hight piloted on the river only once during the *deputy pilot phase*, a fact that Hight does not dispute J.A. 205, 207. The training plan specifically required "trips" to occur during the deputy pilot phase, and that omission is what informed the Coast Guard's pilot-registration decision.

*Second*, Hight argues that Emerson failed to explain why Hight was required to make multiple river trips when, in his view, other deputy pilots were not.

To be sure, "'dissimilar treatment of evidently identical cases' is 'the quintessence of arbitrariness and caprice.'" *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (quoting *Colorado Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988)). But Hight has failed to make any colorable showing of disparate treatment.

Hight claims he identified to the Coast Guard eleven deputy pilots who did not complete river training prior to obtaining pilot registration. Hight Reply Br. 3–4. But the record tells a different story. Hight never identified for the Coast Guard a single individual who had received pilot registration after completing just one evaluated trip on the designated waters of the St. Lawrence River. Instead, in an email exchange with Rajiv Khandpur, Chief of the Coast Guard Office of Waterways and Ocean Policy, Hight vaguely stated: "I suggest you exam[ine] pilot training records from pilot 164 to pilot 173 in order to gain some validity to the history of training by the [Association]." J.A. 208. Hight was pilot 170, J.A. 103, but Hight made no factual representation about the

20

training pilots 164 to 173 received.  Such unsubstantiated and unexamined assertions are insufficient to make out a plausible claim of differential treatment by an agency.

In a portion of his *Hight I* declaration, Hight referred to the training of a different pilot, Christopher Weigler.  J.A. 255–258; *see also* J.A. 107.  But that declaration addressed only Weigler's *applicant* pilot training.  Specifically, Hight averred that he "had approximately the same number of river trips as Weigler[,]" that the two "completed these river trips in the same time and manner[,]" and that Weigler "completed these trips in his first 6 months of training when he was an '*applicant trainee*.'"  J.A. 256 (emphasis added).

That information was beside the point because it said nothing about whether Weigler or any other deputy pilot was registered as a full pilot after taking only one supervised St. Lawrence River trip during the deputy training phase.  In fact, Hight suggested the opposite in his declaration when he said that, after Weigler passed the written exam, the Pilots Association still made him complete additional river trips before registering him as a pilot.  J.A. 257.  That demonstrates consistency with the requirement imposed on Hight in this case.  *See Northstar Wireless, LLC v. Federal Communications Comm'n*, 38 F.4th 190, 205 (D.C. Cir. 2022) (rejecting petitioners' claim of dissimilar treatment when "[t]he record [did] not bear [it] out"); *see also Intellistop Inc. v. United States Dep't of Transportation*, 72 F.4th 344, 351 (D.C. Cir. 2023) ("[A]n agency does not act arbitrarily if it treats dissimilar parties differently[.]").

Finally, Hight claims the Coast Guard's explanations for denying his pilot registration were "pretextual[.]"  Hight Opening Br. 27, 38, 47.  Specifically, Hight insists that Boyce refused to recommend him for registration in retaliation for

21

Hight's questions about the Pilots Association's finances and Boyce's practices, including his close relationship with Haviland. *Id.* at 11–12.

When assessing agency action for pretext, a court is "ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Department of Commerce v. New York*, 588 U.S. 752, 780 (2019) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)). Hight's speculative accusations find no factual support in the record and, without more, are insufficient to upset the presumption that public officials "have properly discharged their official duties." *United States v. Chemical Found.*, 272 U.S. 1, 14–15 (1926).

In sum, the Coast Guard rationally concluded that Hight failed to complete the Pilots Association's mandated river-trip training and, in reaching that conclusion, engaged in reasoned decision-making.[1]

**B**

Hight's private non-delegation challenge fares no better. Generally, a delegation of authority to a private entity is constitutional so long as the private entity acts only "as an aid"

---

[1] Because Hight's failure to complete the training program was an independent and sufficient basis for the Coast Guard's decision, we need not address the Coast Guard's alternative grounds for denying Hight registration. *See BDPCS, Inc. v. Federal Communications Comm'n*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.").

22

to an accountable government agency that retains the ultimate authority to "approve[], disapprove[], or modif[y]" the private entity's actions and decisions on delegated matters. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940). But where Congress does not expressly authorize an agency to delegate authority, "subdelegations to outside parties are assumed to be improper[.]" *United States Telecom Ass'n v. Federal Communications Comm'n.*, 359 F.3d 554, 565 (D.C. Cir. 2004); *see also Louisiana Pub. Serv. Comm'n v. FERC*, 860 F.3d 691, 696 (D.C. Cir. 2017) ("Federal agencies may not subdelegate their 'decision-making authority * * * to outside entities—private or sovereign—absent affirmative evidence of authority to do so.'") (quoting *United States Telecom Ass'n*, 359 F.3d at 566). The only exceptions to that presumption are delegations that involve "'(1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving.'" *International Dark-Sky Ass'n, Inc. v. Federal Communications Comm'n*, 106 F.4th 1206, 1216 (D.C. Cir. 2024) (quoting *United States Telecom Ass'n*, 359 F.3d at 566). As a result, an agency "may turn to an outside entity for advice and policy recommendations, provided the agency makes the final decisions itself." *United States Telecom Ass'n*, 359 F.3d at 568. That is what the Coast Guard did here.

**1**

The Pilots Association advised the Coast Guard of its view on Hight's registration request and helped gather facts relevant to that request from its training program and records. J.A. 67–72, 197–198, 205–207. That is where the Pilots Association's input stopped. Consistent with the procedures established by its governing regulations, the Coast Guard independently reviewed the relevant evidence, including not just information from the Association, but also from Hight, and then exercised

23

final and independent decision-making authority in declining to register Hight.

The Coast Guard independently evaluated whether Hight "completed [the] course of instruction" prescribed by the Pilots Association. 46 C.F.R. § 401.220(b)(2) (2021). In an April 2018 email, Haviland explained to Hight that he was in the "process of auditing the specific items" of the Pilots Association training plan that the Association said Hight had not yet satisfied. J.A. 182. Haviland then openly invited Hight to share records with the Coast Guard demonstrating that he had completed the training. "If I am in error, and you can demonstrate, with records, that you have completed all of your training," Haviland wrote, "I will reconsider my position with regard to issuing the exam." J.A. 183.[2]

Hight responded the next month by sending the Coast Guard 48 pages of trip records. J.A. 193. The Coast Guard sent those documents to the Pilots Association to "validate[.]" J.A. 194–195. But the Coast Guard also separately conducted its own review of the records. *See* J.A. 208–212. Subsequently, the Pilots Association—not Hight—provided the Coast Guard documentation of Hight's only eligible river trip from the deputy pilot phase. *See* J.A. 205–207, 209. All the trips identified by Hight in his documents proved irrelevant because they occurred during the applicant phase, prior to him becoming a deputy pilot. J.A. 208–209.

The Coast Guard also independently determined that Hight lacked the necessary "pilot temperament" based on the two

---

[2] At the time of this exchange, the Coast Guard was focused on whether Hight was eligible to sit for the pilotage exam, but the same evidence underlay the Coast Guard's subsequent registration decision. J.A. 182–183, 270.

24

boating incidents and his "antagonistic and aggressive" emails to Coast Guard staff. J.A. 274; *see also* 46 C.F.R. § 401.210(a)(3) (2021) (requiring pilots to be of "good moral character and temperate habits"). As for the two incidents, the agency investigated the tugboat accident on its own and relied on the Pilots Association only to gather facts about the confrontation on the Federal Hudson. Haviland first learned of the tugboat accident when a representative of the Canadian tugboat company told him about the boat's damage. J.A. 182. Haviland then directed a Coast Guard official to investigate the incident. J.A. 182. For the Federal Hudson incident, the Pilots Association sent Haviland the written account prepared by the Federal Hudson master for Haviland to evaluate on his own. J.A. 172–173.

Finally, in reaching its decision, the Coast Guard received a "recommendation[]" from the Pilots Association about whether to register Hight. *See* 46 C.F.R. § 401.220(c) (2021). Yet the Coast Guard was explicit that the recommendation was mere "input." J.A. 273. In his initial decision, Haviland explained that his practice was to "rely" on association recommendation letters to confirm that applicants had completed their training and had "the requisite knowledge, skill, professionalism, integrity, and judgment to serve" as registered pilots. J.A. 87. But he emphasized that he "would deny [Hight's] request even with a positive endorsement" from the Pilots Association because of Hight's "lack of integrity and judgment[.]" J.A. 87.

Emerson's final decision for the Coast Guard echoed this view. He noted that receiving a recommendation from a pilot association is a "standard industry practice" that "informs a licensing body[,]" and that *Hight I* had not "foreclosed any further input from the [Pilots Association] on Captain Hight's fitness to hold a full registration[.]" J.A. 272–273. But at no

25

point did Emerson suggest that a positive recommendation from the Pilots Association was a mandatory precondition for pilot registration.

In short, the Coast Guard limited the Pilots Association's involvement to "fact gathering" and "advice giving"—two "legitimate" "types" of "outside party input into agency decision-making processes[.]" *United States Telecom Ass'n.*, 359 F.3d at 566. Beyond that, the record shows that the Coast Guard itself reviewed the record, requested additional information from Hight for its consideration, and then reached an independent judgment that Hight failed to satisfy the required training program for registration based on a fact about St. Lawrence River experience that Hight does not dispute.

**2**

Hight and his State amici offer several arguments in response, but none succeeds.

*First*, Hight claims the Pilots Association "furnished" every ground the Coast Guard relied on to deny Hight's registration. Hight Opening Br. 51. That is not true. As described, Haviland learned of the tugboat accident not from the Pilots Association, but from the company whose tugboat was damaged. J.A. 182. The Coast Guard also faulted Hight for the tone of his correspondence with the agency, not with the Pilots Association. J.A. 274.

*Second*, Hight argues that, "[p]rior to this litigation, the Coast Guard was quite open about the fact that it believed that the [Pilots] Association had the final say on who gets to be a pilot." Hight Reply Br. 23. This claim too is belied by the record. Much of Hight's evidence goes to the Pilots Association's control over *employment*, not *registration*. *See,*

26

*e.g.*, J.A. 183, 187 (Coast Guard officials told Hight, "[r]egarding being included in the tour-de-role, that is between you and your pilot association[,]" and "[t]he issues with your employment status [are] between you and the [Association].").

To be sure, on one occasion, a lower-level Coast Guard official suggested that a recommendation from the Pilots Association was necessary for Hight to obtain full pilot registration. J.A. 188. But in his final decision denying Hight's request to take the exam, Emerson explained that *completing training*—not receiving a positive recommendation—was the relevant prerequisite. *See* J.A. 126 ("Because [the written] examination requires travel by the applicant pilot, by Coast Guard personnel, or both, it simply does not make sense to provide an examination to an applicant pilot who may not ultimately complete the association's specified training, which is [a] long-established prerequisite to full registration.").

*Third*, Hight pivots and argues that the Coast Guard impermissibly delegated regulatory authority to the Pilots Association by essentially surrendering control over pilot training to it. *See* Hight Opening Br. 52–53. While Hight presented a version of this argument in his administrative appeal, *see* J.A. 120, he abandoned it before the district court. There, Hight argued only that the Coast Guard impermissibly delegated *registration* authority to the Pilots Association and improperly deferred to the Pilots Association's *interpretation* of the minimum trips requirement. But he did not separately argue that the Association exercised impermissible control over *training*. *See* Hight Mot. Summ. J. [ECF No. 28] 30–36; Hight Opposition to Defs.' Cross-Motion [ECF No. 36] at 14–21 (same). "[A]bsent exceptional circumstances, a party forfeits an argument by failing to press it in district court." *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 910 (D.C. Cir. 2024)

27

(citation omitted). And Hight has not offered any relevant justification for his omission here.

Finally, the State amici argue that the Coast Guard's delegation was unconstitutional because it failed to establish "discernible standards" for pilot associations' "exercise of their authority" and because "[n]either the statutes nor the regulations say what an association should base [its] recommendation on[.]" Amici Br. 19–20. That is not an argument that Hight has ever raised, and "we ordinarily do not entertain arguments not raised by parties[.]" *CSX Transp., Inc. v. Surface Transp. Board*, 754 F.3d 1056, 1064 (D.C. Cir. 2014) (citation omitted). We are especially mindful of that guidance here because of the "longstanding principle of judicial restraint" that requires "courts [to] avoid reaching constitutional questions in advance of the necessity of deciding them." *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (citation omitted).

In sum, the record in this case shows that the Pilots Association's limited role in registration decisions comports with established limitations on agency delegations of authority.

## C

Finally, Hight argues that two related aspects of the Great Lakes pilotage system violate the First Amendment. First, he challenges the requirement that he train with the Pilots Association to become a registered pilot. Second, he argues it is unconstitutional to condition his ability to work as a registered pilot on joining the Pilots Association and purchasing a share of its corporate stock.

Hight's contention that requiring him to work with the Pilots Association to obtain the training necessary to qualify as

28

a pilot violates his right to free association is forfeited because he did not raise it before the district court.  *See Apprio*, 104 F.4th at 910.

As for Hight's concern about having to join the Pilots Association after being registered as a pilot, that claim is not ripe.  Ripeness is a legal doctrine that prevents courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies[.]"  *Chlorine Inst., Inc. v. Federal R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013) (quoting *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 807–808 (2003)).   "Ripeness, while often spoken of as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending."   *National Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

At this point, Hight's claimed injuries—having to join the Pilots Association and purchase its stock—are not "certainly impending" for several reasons. To start, Hight is still only a deputy pilot and, as such, is ineligible to join the Pilots Association.   So he is under no membership obligation at this time.

In addition, it is uncertain when, if ever, the Coast Guard will grant Hight full pilot registration.  Even if Hight completes the required training, registration is not guaranteed.  The Coast Guard once before determined that Hight lacked the temperament necessary to be a maritime pilot.  J.A. 274.  Other barriers to registration could also arise, even assuming that Hight finishes his thus-far incomplete training regimen.

Equally unclear is whether the Pilots Association would permit Hight to join should he receive pilot registration since

29

the Pilots Association has twice recommended he not be allowed to serve as a pilot. *See* J.A. 67–71, 153–154. Given these uncertainties, it is far from imminent—or even foreseeable at the present time—that Hight will be in a position of having to decide whether to join the Pilots Association or purchase its stock in order to pilot on the Great Lakes and St. Lawrence River.

Our "review is inappropriate" when, as here, "deferring consideration might eliminate the need for review altogether." *Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995).

## IV

For the foregoing reasons, we affirm the district court's judgment.

*So ordered.*